808 A.2d 893

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Troy G. DRUMHELLER, Appellant.**

Supreme Court of Pennsylvania.

Argued May 15, 2002.

Decided Sept. 20, 2002.

Reargument Denied Nov. 8, 2002.

118

Timothy Andrew Bowers, Danville, for appellant, Troy G. Drumheller.

Marianne Kreisher Fogelsanger, Robert A. Graci, Harrisburg, for appellee, Com. of PA.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## *OPINION*

Justice NEWMAN.

Troy G. Drumheller (Drumheller) brings this direct appeal from the Judgment of Sentence of the Court of Common Pleas of Columbia County (trial court) that sentenced him to death following his conviction for first-degree murder. After reviewing the claims raised by Drumheller, we affirm the conviction and sentence of death.

### *FACTS AND PROCEDURAL HISTORY*

The evidence suggests that Drumheller and his sometimes girlfriend, Carol Huttenstine (Huttenstine), had a violent and abusive relationship. In fact, Huttenstine filed four separate protection from abuse (PFA) petitions against Drumheller, one in July of 1996, one in February of 1997, one in December of 1997, and the most recent one on January 15, 1999. Each of the PFA petitions contained recitations of acts of abuse perpetrated by Drumheller against Huttenstine, including numerous incidents where Drumheller punched Huttenstine in the face, pulled her hair, kicked her, threw her to the ground, choked her, and threatened to kill her. Following the filing of each petition, the court entered a restraining order against Drumheller. With the last PFA petition, the court issued a temporary restraining order against Drumheller on January 15, 1999, and issued a final restraining order on February 8,

1999, that Huttenstine never requested be discontinued, altered, or modified.

This final PFA order was in effect at the time of Huttenstine's death on April 24, 1999. The court served Drumheller with notice of the January 15, 1999 PFA order restricting his contact with Huttenstine. However, on at least four occasions, Huttenstine reported to police that Drumheller had violated the terms of that order by contacting her. (Notes of Testimony (N.T.), dated December 6, 2000, Volume 4, at 152–153). In fact, on March 2, 1999, approximately six weeks before her death, Huttenstine reported to police that Drumheller had appeared at her home and had grabbed her. *Id.* at 144–148.

On August 12, 1997, Huttenstine had contacted police to provide them with information regarding the drug trafficking activities of Drumheller. Thereafter, Huttenstine became a confidential informant and had contact with police many times. Brenda Thomas (Thomas), another former girlfriend of Drumheller, who was also cooperating with police as a confidential informant, testified that she had first met Huttenstine in May of 1997, at which point Huttenstine showed her bruises and bite marks. According to Thomas, Huttenstine told her that Drumheller had done this by punching her, pulling her hair, biting her, and kicking her with steel-toed boots. *Id.* at 195. While Huttenstine was at Thomas' house, Drumheller appeared and accused them both of plotting against him to set him up on a drug bust. *Id.* at 196. Drumheller allegedly told Huttenstine and Thomas that if "either one of [them] ever did anything to set him up he would kill [them]." *Id.* On other occasions, Drumheller told Thomas that he thought Huttenstine was providing information to police about his drug dealing and that if he "ever found out or had proof to back up his suspicions he would kill her." *Id.* at 197. Cheryl Cerasoli (Cerasoli), the director of Beyond Violence, a women's center that Huttenstine frequented between January of 1999 and her death that April, testified that Huttenstine told her that, "Troy is going to kill me. He knows that I am going to testify against him." *Id.* at 208–209.

Shortly after midnight on April 24, 1999, the date of her murder, Huttenstine appeared at the mobile home of Robert Brockway (Brockway), a friend and co-worker of Huttenstine. Brockway testified that Huttenstine told him that Drumheller had gotten into her house and had started beating her. (N.T., dated December 5, 2000, Volume 3, at 38–39). Huttenstine showed Brockway bruises and bite marks. *Id.* At approximately 1:30 a.m., Brockway and Huttenstine were startled by a loud noise; Brockway testified to the ensuing events as follows:

A: I heard the screen door pulled open and then my inside door was kicked in.

\* \* \*

Q: Once the door swung open and swung back what is the first you observed in regard to your front entrance?

A: The door had swung. It hit the door and it had swung back part way. And the first thing I saw was—it was the light reflecting off of a knife blade.

Q: Subsequent to seeing the knife blade did you see an individual that you recognized?

A: Yes.

Q: Who was that individual?

A: Troy Drumheller walked into the house.

\* \* \*

Q: Mr. Drumheller entered your home that night? Can I assume he had no permission to enter your home?

A: No.

\* \* \*

Q: Once the Defendant entered and closed the door was the knife still in his hand?

A: Yes.... His right hand.

\* \* \*

Q: Sir, what specifically, if you can recall did he say to Carol Huttenstine at that point?

A: As they were arguing she was saying that "I had nothing to do with this." He was just yelling over top of

her about running away from him all the time, going to the police all the time, testifying. It was just a battery of things that he went through.

Q: At any point during that battery of things did he mention a P.F.A. or protection from abuse order?

A: Yes, he did.

Q: What was the last thing that he said to her prior to anything physically happening?

A: Well, as they went through the things, running to the police, the cops, and then "You are going to [expletive deleted] testify." And then he stabbed her.

Q: Sir, where did he stab her?

A: He stabbed her in the left side of the torso.

\* \* \*

Q: At that point, Sir, did you react or do anything?

A: Yes, I said, "Troy don't do this," you know, you know, "there is nothing going on. I don't know what is going on. It has nothing to do with me."

Q: And what did he say to you?

A: He told me, he said, "shut the [expletive deleted] up, boyfriend."

Q: Did he then make a move in your direction?

A: Yes.

Q: Can you explain what he did?

A: The area was—it was only a ten-foot wide trailer. And with the furniture in there there is only a few spaces you can walk through it. And, he just took like two steps and he stabbed me [in] my left breast.

\* \* \*

A: I looked up at him. I couldn't believe he did this. And he laughed and he said, "See that? Look at that. You are bleeding. You are going to die tonight. We are all going to die tonight."

\* \* \*

A: [He then turned back to Carol.] He was facing Carol, away from me. And when I stood up he turned to face me again.

Q: Was the knife still in his right hand?

A: Yes.

Q: At that point, did Carol do something that distracted him?

A: Yes, she was holding the phone up. She grabbed the phone and she hit the talk button and it beeped and she started dialing.

Q: What did the Defendant do at that point?

A: He grabbed the phone with his left hand and I couldn't really see what he did, but it looked like a punching motion and the phone was smashed.

\* \* \*

Q: At that point was there any conversation between Carol and yourself?

A: Yes. Right when he grabbed the phone and smashed it she said, "Bob, go get help. Go next door."

Q: Did you start to run out the back of the trailer?

A: Yes.

Q: Prior to exiting the trailer, did you look back at Carol and say anything?

A: Yes, I fell at the door. I was dizzy when I got up. When I ran off, and I stood up, and I turned around, and I told her "Carol, I am going for help."

Q: Do you know whether the Defendant still had physical possession of the knife?

A: Yes, he did.

Q: Where was he the last time you saw the Defendant? Where was he in relation to Carol?

A: Standing right next to the chair yelling at her.

(N.T., Volume 3, at 43–51). Brockway made it to the home of a neighbor, who called the police and the paramedics. At 1:44 a.m., the State Police arrived at the scene and observed

Huttenstine's motionless body laying on the floor of Brockway's mobile home.

Dr. Michael Kenny (Dr. Kenny), the coroner and a forensic pathologist, pronounced Huttenstine dead at 2:41 a.m. and estimated the time of death to be 1:35 a.m. Dr. Kenny testified that Huttenstine was stabbed twenty-one different times, of which six of the wounds were potentially fatal. (N.T., dated December 5, 2000, Volume 2, at 39, 54). He stated that the stab wounds were at different orientations and angles, indicating a struggle, which was corroborated by a myriad of defensive wounds present on Huttenstine's hands. *Id.* at 56. Additionally, Dr. Kenny observed bruising on Huttenstine's body, including her knee, thigh, and arm, which he estimated had been inflicted within the three to five days preceding her death. *Id.* at 45.

Following a nine-hour search, the police arrested Drumheller and charged him with murder,[1] attempted murder,[2] two counts of aggravated assault,[3] two counts of aggravated assault with a deadly weapon,[4] and burglary.[5] The police confiscated the clothing that Drumheller was wearing at the time of his arrest and tested it. The tests revealed the presence of blood consistent with that of Huttenstine on Drumheller's sweatshirt. (N.T., Volume 4, at 67–68, 82, 90).

The trial court appointed a public defender to represent Drumheller. On June 28, 1999, the Commonwealth informed Drumheller and the court of its intention to seek the death penalty. On July 28, 1999, Drumheller filed an omnibus pretrial motion seeking, *inter alia,* a change of venue or venire. On November 1, 1999, the trial court continued the motion for change of venue or venire until jury selection. On November 9, 1999, the voters of Columbia County elected Drumheller's

1. 18 Pa.C.S. § 2501(a).
2. 18 Pa.C.S. § 901(a).
3. 18 Pa.C.S. § 2702(a)(1).
4. 18 Pa.C.S. § 2702(a)(4).
5. 18 Pa.C.S. § 3502(a).

public defender to the position of District Attorney, so the trial court appointed new defense counsel.

On October 23, 2000, the trial court rejected Drumheller's motion for a change of venue or venire, reasoning that the press releases concerning the crime were "not so inflammatory that the court cannot say for certain that a jury could not be obtained from a local county pool." *Commonwealth v. Drumheller*, No. 99–364, slip op., at 2 (Pa.C.C.P. October 23, 2000). However, the trial court did reserve the right to revisit this issue during jury selection if it became clear at that point that the pre-trial publicity of the case rendered it impossible to select an impartial jury.

On November 13, 2000, the Commonwealth filed a motion *in limine*, requesting permission to introduce evidence of the prior acts of Drumheller's abuse of Huttenstine, his prior arrest on drug charges, and Huttenstine's cooperation with police with regard to that arrest. On November 28, 2000, the trial court ruled this evidence admissible. Jury selection commenced later that day and concluded on December 5, 2000; the court did not revisit the request by Drumheller for a change of venue or venire. On December 7, 2000, the jury convicted Drumheller of all crimes with which he had been charged.

In the ensuing penalty phase hearing for the first-degree murder conviction, the Commonwealth presented five aggravating circumstances to the jury: (1) Huttenstine was a prosecution witness to a felony committed by Drumheller and was killed to prevent her testimony;[6] (2) Drumheller committed the killing while in perpetration of a felony;[7] (3) in committing the offense, Drumheller knowingly created a grave risk of death to Brockway;[8] (4) at the time of the killing, Huttenstine had provided police with information concerning criminal activity and the killing was in retaliation for her activities in

6. 42 Pa.C.S. § 9711(d)(5).

7. 42 Pa.C.S. § 9711(d)(6).

8. 42 Pa.C.S. § 9711(d)(7).

providing this information;[9] and (5) at the time of the killing, Drumheller was subject to a court order restricting his behavior toward Huttenstine.[10] Drumheller presented two mitigating circumstances: (1) Drumheller was under the influence of extreme mental or emotional disturbance;[11] and (2) any other evidence of mitigation concerning the character and record of Drumheller and the circumstances of his offense (the catchall mitigator).[12]

The jury unanimously found the existence of three aggravating circumstances: (1) Drumheller committed the killing while in perpetration of a felony; (2) in committing the offense, Drumheller knowingly created a grave risk of death to Brockway; and (3) at the time of the killing, Drumheller was subject to a court order restricting his behavior toward Huttenstine. The jury found the existence of one mitigating circumstance, namely that Drumheller was under the influence of extreme mental or emotional disturbance. The jury determined that the aggravating circumstances outweighed the mitigating circumstance and, accordingly, sentenced Drumheller to death.

Immediately following the penalty phase, the trial court sentenced Drumheller to an additional term of twenty to forty years imprisonment for the attempted murder of Brockway and ten to twenty years imprisonment for the burglary conviction, those sentences to run consecutively to each other and to the death sentence. The court determined that the four aggravated assault and aggravated assault with a deadly weapon convictions merged into the sentences imposed for first-degree murder and attempted murder.

## DISCUSSION

### I. Guilt Phase—Change of Venue or Venire

 Drumheller first argues that the trial court erred by denying his motions for change of venue or venire because the

9. 42 Pa.C.S. § 9711(d)(15).

10. 42 Pa.C.S. § 9711(d)(18).

11. 42 Pa.C.S. § 9711(e)(2).

12. 42 Pa.C.S. § 9711(e)(8).

pre-trial publicity of the case rendered a fair and impartial jury impossible to obtain. "The trial court's decision on appellant's motions for change of venue/venire rests within the sound discretion of the trial judge, whose ruling thereon will not be disturbed on appeal absent an abuse of that discretion." *Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203, 213 (1997), *cert. denied*, 523 U.S. 1024, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998); *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439, 450 (1995). "In reviewing the trial court's decision, our inquiry must focus upon whether any juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pre-trial publicity." *Marinelli*, 690 A.2d at 213.

"A change in venue becomes necessary when the trial court concludes that a fair and impartial jury cannot be selected in the county in which the crime occurred." *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 872 (2000), *petition for cert. filed* (U.S. Mar. 15, 2002) (No. 01–9230); *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1092 (1998); *cert. denied*, 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999). "Normally, one who claims that he has been denied a fair trial because of pretrial publicity must show actual prejudice in the empanelling of the jury. In certain cases, however, pretrial publicity can be so pervasive or inflammatory that the defendant need not prove actual juror prejudice." *Bridges*, 757 A.2d at 872 (internal citations omitted). "Pretrial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted toward conviction rather than factual and objective; (2) the publicity reveals the defendant's prior criminal record, or if it refers to confessions, admissions or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports." *Commonwealth v. Weiss*, 565 Pa. 504, 776 A.2d 958, 964 (2001), *petition for cert. filed* (U.S. Mar. 11, 2002) (No. 01–9175).[13]

13. Note that in *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129, 1141 (1996), *cert. denied*, 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997), we stated that a defendant only needs to demonstrate one of these three elements for a court to presume pre-trial prejudice.

▬▬ Even where pre-trial prejudice is presumed, "a change of venue or venire is not warranted unless [the defendant] also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Karenbauer,* 715 A.2d at 1092; *Rucci; Commonwealth v. Breakiron,* 524 Pa. 282, 571 A.2d 1035, 1037 (1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990).

In testing whether there has been a sufficient cooling period, a court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove. Although it is conceivable that pre-trial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

*Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 104 (1996), *cert. denied,* 504 U.S. 946, 112 S.Ct. 2290, 119 L.Ed.2d 214 (1997) (citing *Breakiron,* 571 A.2d at 1037–1038, n. 1).

▬▬ In the case *sub judice,* Drumheller presented the court with seven newspaper articles about his case; the most recent article was dated July 27, 2000, four months prior to the commencement of jury selection. Drumheller also presented radio broadcast transcripts, but the latest radio broadcast was on June 3, 1999, more than seventeen months prior to jury selection. We can presume pre-trial prejudice by virtue of these newspaper articles and radio broadcast transcripts,

which: (1) were arguably sensational and inflammatory; (2) mentioned Drumheller's prior drug convictions; and (3) were based on police and prosecution information. Thus, we must determine whether this pre-trial publicity so saturated the community and whether there was a sufficient cooling-off period.

The trial court conducted *voir dire* over a period of five days. The court interviewed eighty-nine potential jurors, of which sixty had either read or heard something about the case. Most of the potential jurors indicated that they had read or heard very little about the case and could not remember a whole lot of what they had read or heard. Most of the prospective jurors stated that they would be able to put aside what they had read or heard and decide the case fairly and impartially by listening to the evidence presented in the courtroom; most of the members of the venire panel confirmed that they had not read or heard anything about the case in quite some time. The actual jurors empanelled remembered very little of what they had read or heard; three of the actual jurors had no knowledge of the case. Each of the jurors empanelled declared that they would be able to put any prior knowledge of the case aside and decide the case solely on the evidence presented in the courtroom. As the trial court correctly determined, the *voir dire* process demonstrated that the community was not saturated by pre-trial publicity about this case and that there had been a cooling-off period sufficient to ensure that the selected jurors would be able to fairly and impartially consider the case against Drumheller. Therefore, we hold that the trial court did not abuse its discretion in denying the motion for change of venue or venire filed by Drumheller.

## II. *Guilt Phase—Prior Incidents of Abuse*

Drumheller asserts that the trial court erred in permitting the Commonwealth to present evidence of past incidents of abuse perpetrated by Drumheller against Huttenstine. Specifically, he submits that the trial court improperly admitted evidence of the first three PFA petitions and orders, dated

July 26, 1996, February 21, 1997, and December 5, 1997, because they were too far removed from the date of the crime (April 24, 1999). Drumheller points to *Commonwealth v. Albrecht,* 510 Pa. 603, 511 A.2d 764 (1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987), for the proposition that evidence of prior abuse is admissible to demonstrate motive only when those incidents of prior abuse occurred within the seven month period preceding the date of the charged offense. Drumheller concedes that admission of the most recent PFA order and subsequent violations of that order was proper.

 "Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Stallworth,* 566 Pa. 349, 781 A.2d 110, 117–118 (2001) (internal citations omitted). Pursuant to the Pennsylvania Rules of Evidence:

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

(4) In criminal cases, the prosecution shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of any such evidence it intends to introduce at trial.

Pa. R. Evid. 404(b); *see Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040, 1044 (1998).

In *Albrecht*, the defendant argued that evidence of his prior abuse of his wife should not be admitted at his murder trial for killing his wife because the evidence of prior abusive acts was inflammatory and more prejudicial than probative. The trial court rejected this position, but limited the evidence to events occurring within the seven-month period prior to the death of the defendant's wife. The trial court reasoned that evidence arising before that time was too remote. *Albrecht*, 511 A.2d at 772. We affirmed the trial court on the issue of admissibility, holding as follows:

[W]e note the existence of numerous instances of violent and hateful conduct between Appellant and his wife. Had there been only an isolated incident, that evidence would have been inadmissible. *Commonwealth v. Baker*, 466 Pa. 382, 353 A.2d 406 (1976). We are not confronted, however, with an isolated incident. Rather, the Commonwealth produced a chain of evidence illustrating Appellant's continual abuse of his wife. Several witnesses testified to marital problems Appellant and his wife experienced on the very night of the killings. Photographs illustrating the wife's battered condition, including cigarette burns on her face, were admitted into evidence after witnesses testified to her continuous gruesome appearance. Appellant not only admitted to slapping his wife occasionally, but that he was under court order to forego the physical abuse of his wife. The trial court ruling admitting evidence of Appellant's actions towards his wife for a period of seven months prior to the house burning was proper as it went to showing his ill-will and malice towards her, establishing his homicidal motive, and culminated in his murdering her.

*Id.* However, contrary to Drumheller's position in the present case, *Albrecht* did not address whether the trial court's time limitation was proper; rather the issue before this Court was whether the trial court properly admitted the evidence of prior abuse. Nowhere in *Albrecht* do we state or imply that evidence of acts of abuse that occur more than seven months

prior to the date of the charged offense is not admissible. We did not in *Albrecht,* nor have we ever, set an express limitation that only evidence of acts occurring within a certain period of time prior to the charged offense are admissible.

In *Commonwealth v. Ulatoski,* 472 Pa. 53, 371 A.2d 186 (1977), the trial court admitted the testimony of three witnesses who observed bruises on the body of the decedent (the defendant's wife) as much as seventeen months before her death. The Commonwealth introduced evidence of the prior acts of abuse to show that the death of the defendant's wife was more likely intentional than accidental. The defendant countered that this evidence was too remote in time to be relevant. We rejected the defendant's argument concluding that, although "the testimony may involve events so remote from the date of the crime that it has no probative value ... no rigid rule can be formulated for determining when such evidence is no longer relevant." *Id.* at 191. In *Commonwealth v. Petrakovich,* 459 Pa. 511, 329 A.2d 844 (1974), we held that "[a]lthough evidence of (prior occurrences) which is too remote is not properly admissible ... it is generally true that remoteness of the prior instances of hostility and strained relations affects the **weight** of that evidence and **not its admissibility.**" *Id.* at 850 (emphasis added) (internal citation omitted); *Ulatoski,* 371 A.2d at 191.

In *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90 (1995), *cert. denied,* 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995), we stated that "our courts will allow evidence of prior bad acts where the distinct crime or bad act 'was part of a chain or sequence of events which formed the history of the case and was part of its natural development.'" *Id.* at 99 (quoting *Commonwealth v. Sam,* 535 Pa. 350, 635 A.2d 603, 607 (1993), *cert. denied,* 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994)). While in the case *sub judice* the evidence of prior incidents of abuse stretches back to approximately thirty-four months before Huttenstine's death, there is no time limitation on when such evidence becomes inadmissi-

138

ble.[11] In the present case, the evidence suggests that the abuse by Drumheller of Huttenstine continued during this entire three-year period. All four PFA petitions are relevant to demonstrate what the Commonwealth accurately characterizes as "the continual and escalating nature of Drumheller's abuse of Huttenstine." (Brief of Commonwealth, at 40). The challenged evidence shows the chain or sequence of events that formed the history of the case, is part of the natural development of the case, and demonstrates Drumheller's motive, malice, intent, and ill-will toward Huttenstine.

▮ The trial court gave the jury the following instruction during the course of testimony:

> People there has been throughout the whole of today a significant quantity of evidence regarding prior bad conduct on the part of Mr. Drumheller that has been entered into the record.

> I have permitted this evidence to be entered into the record not as evidence that he committed the offenses for which he is on trial today. Rather, this evidence today that was entered with respect to prior bad conduct is permitted solely and only for the purpose of the Commonwealth attempting to prove malice and ill will[,] motive[,] intent and to show that chain in sequence of events on the part of Mr. Drumheller. And that is the limited purpose for which the bad conduct part of today's testimony was entered into the record.

(N.T., Volume 4, at 214). During the final instructions to the jury before deliberating, the court repeated this instruction, again informing the jurors that the court admitted the evidence of Drumheller's prior bad acts, including the evidence of his abuse of Huttenstine, only for the "limited purpose of acting as evidence of malice, ill will, motive, intent and to show

14. *See Commonwealth v. Lilliock,* 740 A.2d 237 (Pa.Super.1999), *petition for allowance of appeal denied,* 568 Pa. 657, 795 A.2d 972 (2000), where the Superior Court affirmed the trial court's exercise of discretion in admitting evidence of a temporary seven-day PFA order dated twelve years prior to the charged offense and another PFA order received eight months after the charged offense.

that chain and sequence of events involved in the facts leading to the charges in this case." (N.T., dated December 7, 2000, Volume 5, at 154). "The law presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown,* 567 Pa. 272, 786 A.2d 961, 971 (2001); *Commonwealth v. O'Hannon,* 557 Pa. 256, 732 A.2d 1193, 1196 (1999) ("[a]bsent evidence to the contrary, the jury is presumed to have followed the trial court's instructions").

The court informed the jury of the limited use of the evidence of Drumheller's prior abuse of Huttenstine, namely that it could only be used to demonstrate the chain or sequence of events that formed the history of the case and Drumheller's motive, malice, intent, and ill-will. As the four PFA petitions at the very least form the chain and sequence of events leading up to Huttenstine's death, we hold that the trial court did not clearly abuse its discretion in admitting evidence of all four PFA petitions and orders.

### III. *Guilt Phase—Prior Drug Arrest*

In the same manner as the preceding claim, Drumheller argues that the trial court erred in admitting evidence concerning Drumheller's August 27, 1997 arrest on drug charges and Huttenstine's involvement with that arrest. Specifically, Drumheller contends that there was an insufficient nexus between the drug arrest and Huttenstine's murder to render the evidence relevant. The Commonwealth avers that Drumheller's drug arrest and the fact that it was Huttenstine who informed the police of the drug trafficking activities of Drumheller, provided a motive for Drumheller to kill Huttenstine, which would render the evidence admissible if the court deemed it more probative than prejudicial. Pa. R. Evid. 404(b).

"As a general rule, evidence that a defendant has committed another crime wholly independent and unconnected with that for which he is on trial is irrelevant and inadmissible except under special circumstances[, such as] where the proffered testimony tends to establish the defendant's motive for the crime or crimes charged . . . ." *Commonwealth v. Martin,*

479 Pa. 63, 387 A.2d 835, 838 (1978). "However, to be admissible under this exception, evidence of a distinct crime, even if relevant to motive, 'must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances.'" *Id.* (quoting *Commonwealth v. Schwartz*, 445 Pa. 515, 285 A.2d 154, 158 (1971)).

On August 12, 1997, Huttenstine contacted police with information that Drumheller was dealing large quantities of cocaine in the Berwick area. (N.T., Volume 4, at 179). On August 26, 1997, Huttenstine again contacted police to advise them that Drumheller would be traveling to New York the following day to purchase cocaine and that he would be driving home in a red Pontiac Grand Prix on Interstate 80 and State Route 93. *Id.* at 181–182. Based on this information, police set up surveillance, witnessed his car en route to New York at approximately 7:30 a.m. on August 27, 1997, and arrested him upon his return at 12:00 p.m. that afternoon. *Id.* at 182. The officer with whom Huttenstine had contact regarding Drumheller, Stephen Savage (Officer Savage), testified that Huttenstine had expressed reluctant willingness to testify against Drumheller to "rid herself of him." *Id.* at 184–185. Cerasoli testified that Huttenstine told her on numerous occasions that Drumheller had said to Huttenstine "I know you are the one that turned me in. . . . I know you turned me in. I know you turned me in." *Id.* at 208–209. At trial, Thomas testified that in May of 1997, Drumheller had threatened to kill Huttenstine if she ever did anything to set him up. *Id.* at 196. Thomas also testified, when questioned by the prosecution, as follows:

Q: Did [Drumheller] ever indicate to you other than the time in May of 1997 when [Huttenstine] was present that he thought [Huttenstine] was providing information to the police?

A: All the time.

Q: What would he say to you?

A: If he ever found out or had proof to back up his suspicions he would kill her.

Q: Why did he have these suspicions?

A: Because drugs were missing, money would be missing and she had a friend that was a state police officer.

Q: What did he suspect or did he suspect anything that [Huttenstine] was doing with this money and drugs?

A: Taking it to the police.

*Id.* at 197.

This evidence provides a basis for Drumheller's motive to kill Huttenstine and, as such, was relevant to the charged murder. The evidence gave the jury sufficient ground to believe that the murder of Huttenstine grew out of or in some way was caused by the prior set of facts and circumstances. *Martin,* 387 A.2d at 838; *Schwartz,* 285 A.2d at 158. As it had related to the evidence of prior acts of abuse discussed above, the trial court issued a limiting instruction to the jury that informed them that evidence of Drumheller's drug charges was admissible only to prove motive, malice, intent, or ill-will. (N.T., Volume 4, at 214; N.T., Volume 5, at 169–170). The evidence of Drumheller's drug arrest is relevant to prove his motive for killing Huttenstine and is more probative than prejudicial. Thus, the trial court did not abuse its discretion in permitting the Commonwealth to introduce this evidence at trial.

IV. *Guilt Phase—Sufficiency and Weight of the Evidence*

 Drumheller next alleges that the evidence presented during the guilt phase was insufficient to support his conviction for first-degree murder and that the weight of the evidence militated against conviction. "When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt." *Weiss,* 776 A.2d at 963. "The elements of first-degree murder are that the defendant unlawfully killed a human being, the defendant killed with malice aforethought, and the killing was willful, deliberate, and premeditated." *Commonwealth v.*

*Wesley,* 562 Pa. 7, 753 A.2d 204, 208 (2000); *Commonwealth v. Cox,* 556 Pa. 368, 728 A.2d 923, 929 (1999), *cert. denied,* 533 U.S. 904, 121 S.Ct. 2246, 150 L.Ed.2d 233 (2001); *see also* 18 Pa.C.S. § 2502(a) and (d). The willful, deliberate, and premeditated intent to kill is the element that distinguishes first-degree murder from other degrees of murder. *Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293, 297 (1996), *cert. denied,* 519 U.S. 951, 117 S.Ct. 364, 136 L.Ed.2d 255 (1996). "[T]he Commonwealth can prove the specific intent to kill through circumstantial evidence." *Weiss,* 776 A.2d at 963. "The use of a deadly weapon on a vital part of the victim's body may constitute circumstantial evidence of a specific intent to kill." *Id.; Commonwealth v. Bond,* 539 Pa. 299, 652 A.2d 308, 311 (1995).

The evidence presented at trial established that, in the early morning hours of January 24, 1999, Drumheller kicked open the door to the mobile home owned by Brockway and he was carrying a large knife. Once inside, Drumheller latched the door and began screaming at Huttenstine about "running away from him all the time, going to the police all the time, testifying [against him]." (N.T., Volume 3, at 45). Drumheller then stabbed Huttenstine in the left side of her torso, turned to Brockway, stabbed Brockway in the chest, laughed, and stated the following: "See that? Look at that. You are bleeding. You are going to die tonight. We are all going to die tonight." (N.T., Volume 3, at 46–47). At some point in after 1:30 a.m., Brockway left the mobile home to get help. At 1:44 a.m., police arrived at the scene and found Huttenstine dead. The coroner testified that the time of death was 1:35 a.m., no more than five minutes after Brockway left the mobile home. Huttenstine had been stabbed twenty-one times in the chest, abdomen, and side, six of which were potentially fatal, and the coroner stated that the "wounds [were] consistent with having been inflicted by a single perpetrator with a single knife." (N.T., Volume 2, at 56). Moreover, the police found blood consistent with the blood of Huttenstine on a sweatshirt worn by Drumheller at the time of his arrest, nine hours after Huttenstine's death. This

evidence was sufficient to convict Drumheller of first-degree murder.

 Drumheller also avers that the weight of the evidence does not support his first-degree murder conviction. "[A] new trial can only be granted on a claim that the verdict was against the weight of the evidence in the extraordinary situation where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Simpson*, 562 Pa. 255, 754 A.2d 1264, 1270 (2000), *cert. denied*, 533 U.S. 932, 121 S.Ct. 2556, 150 L.Ed.2d 722 (2001). "An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we can only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 501 (1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998) (internal citations omitted). Clearly, the verdict in this case is not contrary to the weight of the evidence and does not shock one's sense of justice. Accordingly, we reject Drumheller's challenges to the sufficiency and weight of the evidence.

### V. *Penalty Phase—Grave Risk of Death Aggravating Circumstance*

 Drumheller's final allegation of error is that the trial court erred in allowing the Commonwealth to present the grave risk of death aggravator to the jury during the penalty phase. Drumheller contends that he did not create a grave risk of death to Brockway because Brockway's injuries were not life threatening. Alternatively, Drumheller avers that even if he did create a grave risk of death to Brockway, that risk was not created during commission of the murder of Huttenstine because Brockway was able to leave the mobile home before Huttenstine was killed. Preliminarily, it is important to note that "[a] death sentence will only be reversed if the jury relied on an unsupported and, therefore, improper aggravating circumstance in rendering its penalty phase ver-

dict." *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 519 (1995), *cert. denied,* 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996).

■■ "Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on . . . the aggravating circumstances . . . as to which there is **some evidence.**" 42 Pa.C.S. § 9711(c)(1)(i) (emphasis added); *accord Commonwealth v. Buck,* 551 Pa. 184, 709 A.2d 892, 896 (1998) (the trial court is required to instruct the jury on aggravating circumstances supported by some evidence). The grave risk of death aggravator provides that it is an aggravating circumstance if "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense." 42 Pa.C.S. § 9711(d)(7). "When considering whether the evidence supports a finding that the [grave risk of death aggravator] is applicable, 'we review the actor's conduct to determine whether his conduct brought others into a life threatening situation.'" *Commonwealth v. Thompson,* 559 Pa. 229, 739 A.2d 1023, 1029 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000) (quoting *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624, 628 (1991)).

We have held that the grave risk of death aggravator "applies to situations where the defendant in the course of killing his particular victim acts in a manner which endangers the lives of others close in proximity to the intended or actual victim." *Commonwealth v. Stokes,* 532 Pa. 242, 615 A.2d 704, 713 (1992); *see also Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507, 525 (1999). "Sufficient evidence to support the application of the aggravating circumstance of creating a grave risk of harm to persons other than the murder victim, has been found by this Court in those instances where the other persons are **in close proximity to the decedent at the time of the murder,** and due to that proximity are **in jeopardy of suffering real harm.**" *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439, 456 (1995) (emphasis added) (internal quotations omitted).

In light of these principles, we now review the arguments presented by Drumheller. Drumheller's first assertion, that he did not create a grave risk of death to Brockway, is baseless. Drumheller points us to the testimony of Dr. Cynthia Graves (Dr. Graves), the emergency room physician who treated Brockway immediately following the incident. Drumheller characterizes the testimony of Dr. Graves as standing for the proposition that Brockway's stab wounds inflicted by Drumheller were "superficial" and "not life-threatening." (Brief of Drumheller, at 13). Dr. Graves testified that Brockway's wound was superficial to the chest cavity, meaning that it did not pierce into the chest cavity, but stated that the knife with which Drumheller stabbed Brockway came within one-half of an inch of entering the chest cavity, which contains the heart, aorta, and pulmonary vessels. (Graves Transcript, November 6, 2000, at 18–22). While Brockway's injury was far less severe than it could have been, the actual injury he suffered is irrelevant to the determination of whether Drumheller put him in grave risk of death. *Mitchell,* 599 A.2d at 628 ("[t]he fact that another person is lucky, and is not injured, is of no importance"). The relevant question is whether Drumheller's conduct brought Brockway into a life-threatening situation, not whether Brockway's wound itself was life-threatening. *Id.* We hold that Drumheller's act of knowingly stabbing Brockway in the chest created a grave risk of death to Brockway.

As Drumheller notes, this alone is not enough to submit the aggravating circumstance to the jury; the grave risk of death to Brockway must have occurred "in the commission" of Huttenstine's murder. 42 Pa.C.S. § 9711(d)(7). *See also Paolello,* 665 A.2d at 456. Hence, our inquiry turns on the point in time at which commission of the murder of Huttenstine started. If the stabbing of Brockway occurred before the murder started, then the fact that Drumheller put Brockway in grave risk of death is of no moment because that risk would not have occurred in the commission of Huttenstine's murder. Drumheller argues that Brockway was not in close proximity to Huttenstine at the time of the murder, and

therefore was not placed in grave risk of death during the murder, because he departed the mobile home while Huttenstine was still alive.

A first-degree murder commences when the defendant possesses the specific intent to kill, takes some affirmative act to bring about the death of the victim, and the actions of the defendant eventually result in the death of the victim. "The period of reflection necessary to constitute premeditation may be very brief; in fact the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." *Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116, 1124 (2001), *cert. denied*, 535 U.S. 906, 122 S.Ct. 1207, 152 L.Ed.2d 145 (2002). "It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder. We have held that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill." *Commonwealth v. Bolden*, 562 Pa. 94, 753 A.2d 793, 797 (2000) (quoting *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225, 233–234 (1999), *cert. denied*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000)).

In the case *sub judice*, Drumheller kicked open the door to Brockway's mobile home, carrying a large knife, with knowledge that Brockway and Huttenstine were inside. Drumheller latched the door and began screaming at Huttenstine about "running away from him all the time, going to the police all the time, testifying [against him]." (N.T., Volume 3, at 45). Drumheller then stabbed Huttenstine in the left side of her torso. This evidence was sufficient to establish Drumheller's specific intent to kill Huttenstine. At this time began Drumheller's murder of Huttenstine. Immediately thereafter, Drumheller stabbed Brockway in the chest, placing the latter in grave risk of death as was above discussed. Drumheller then told Brockway: "You are going to die tonight. We are all going to die tonight." (N.T., Volume 3, at 47–48). Accordingly, there was at least some evidence that Drumheller knowingly placed Brockway in grave risk of death in the

commission of the murder of Huttenstine. Drumheller seems to take the position that the phrase "commission of the offense" should be limited to the exact moment in time when Huttenstine died, but he cites no authority for that position. As the court is required to instruct the jury on any aggravating circumstance for which there is "some evidence," the trial court did not err in allowing the jury to consider that aggravator.

The court instructed the jury on this aggravating circumstance as follows:

> The second aggravating factor that you may find under the law is that an aggravating circumstance exists where in the commission of the offense [Drumheller] knowingly created a grave risk of death to another person in addition to the victim of the offense. [Drumheller] acted knowingly if at the time he committed the offense he is aware and fully conscious that his conduct was of such a nature as to create a grave risk of death to a person other than the deceased.

> In order to create a grave risk of death it is necessary that [Drumheller's] conduct created a substantial likelihood that a person other than the deceased would be killed. It is not sufficient that [Drumheller's] conduct merely created a dangerous situation or placed another person at risk. It is for you to determine from the facts of that case whether or not [Drumheller] knowingly created a grave risk of death to a person other than the deceased.

> Remember, it is the Commonwealth's burden to prove this aggravating circumstance beyond a reasonable doubt. If you are satisfied beyond a reasonable doubt that in the commission of the offense Mr. Drumheller knowingly created a grave risk of death to another, in addition to the victim, then you may find this aggravating circumstance. Otherwise, you should not find this aggravating circumstance.

(N.T., dated December 8, 2000, Volume 6, at 88–89). This charge properly instructed the jury of the pre-requisites for finding the grave risk of death aggravating circumstance and the evidence, when viewed in the light most favorable to the

Commonwealth as verdict winner, was sufficient to enable the jury to find the existence of this aggravating circumstance.

## CONCLUSION

We conclude that none of the claims of error raised by Drumheller warrant relief. There was sufficient evidence to support the aggravating circumstances found by the jury in imposing the death penalty.[15] After a thorough review of the record, we have determined that the sentence of death was not the product of passion, prejudice, or any factor that was improper. We affirm the sentence of death imposed upon Troy G. Drumheller. Pursuant to 42 Pa.C.S. § 9711(i), we direct the Prothonotary of the Supreme Court of Pennsylvania to transmit, within ninety days, the complete record of this case to the Governor of Pennsylvania.