J-S48038-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GARFIELD PATRICO ALEXANDER, | |
| Appellant | No. 232 MDA 2017 |

Appeal from the Judgment of Sentence May 15, 2015
in the Court of Common Pleas of Lackawanna County
Criminal Division at No.: CP-35-CR-0001238-2014

BEFORE:  OTT, J., STABILE, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                      **FILED SEPTEMBER 20, 2017**

Appellant, Garfield Patrico Alexander, appeals *nunc pro tunc* from the judgment of sentence imposed pursuant to his jury conviction of two counts each of aggravated assault and terroristic threats, and one count each of simple assault, recklessly endangering another person, unlawful restraint, and criminal attempt-aggravated assault.[1]  We affirm.

We take the following factual background from the trial court's March 30, 2017 opinion and our independent review of the certified record.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2702(a)(1), 2706(a)(1), 2701(a)(1), 2705, 2902(c)(1), and 901(a), respectively.

On July 16, 2014, the Commonwealth filed a criminal information against Appellant charging him with criminal attempt-homicide, aggravated assault, terroristic threats, simple assault, recklessly endangering another person, and unlawful restraint, related to a domestic incident that occurred on June 11, 2014. On February 23, 2015, the Commonwealth amended the information to include a count for attempt-aggravated assault. The Commonwealth also filed a motion *in limine* seeking to introduce prior bad act evidence pursuant to Pennsylvania Rule of Evidence 404(b). After argument, the trial court granted the motion over Appellant's objection. On March 17, 2015, trial commenced.

The trial court aptly describes what occurred at trial in its March 30, 2017 opinion:

> The evidence at trial demonstrated that on or about June 11, 2014, members of the Scranton Police Department were directed to report to 917 Slocum Avenue, Scranton, Pennsylvania to assist in the investigation of a domestic dispute which resulted in the stabbing of a seventeen (17) year old male. Upon arrival, police officers were notified that the victim was in critical condition and had already been transported to the hospital.
>
> At trial, the victim, Dyshawn Cunningham, (hereinafter, "Victim")[,] identified his stepfather, [Appellant,] as the individual who stabbed him during a domestic dispute that morning at his residence. The victim stated that he was awakened by a loud fight between his mother and [Appellant]. After being awakened, the [V]ictim went downstairs and noticed that [Appellant] was on top of his mother assaulting her. The [V]ictim then ordered [Appellant] to get away from his mother, at which point [Appellant] pulled a knife and screamed[,] "Get [down] on the ground, [I'm gonna take] everyone out tonight!" (N.T. Trial, 3/18/15, at 100-01). The [V]ictim then attempted to

protect his mother by striking [Appellant] with a piece of wood, at which point [Appellant] stabbed him once in the left chest and twice in the back. [Appellant] then fled the residence.

During the trial, [Appellant's] wife and the [V]ictim's mother, Danielle Alexander, corroborated [the Victim's] details of the events that occurred on June 11, 2014. [Ms.] Alexander testified that on the morning of the incident, she was awoken by [Appellant] "coming in, he was screaming, yelling at me, and he grabbed me by my hair and drug me out to the kitchen." (N.T. Trial, 3/17/15, at 169). After having dragged [Ms.] Alexander by her hair into the kitchen of her home, he pinned her down on the ground [] with his knees on her shoulders. She then testified that [the Victim] came down while [Appellant] was assaulting her, and he said[,] "Get off my mom." (**Id.** at 171). [Appellant] then "got up and turned around and said, []'No, you guys are going to listen to me tonight. Both of you get down on the ground, put your hand[s] behind your back. I'm going to take everybody out tonight.'" (**Id.** at 171-72). She then testified that [Appellant] pulled out a butcher knife while she was still laying on the ground, at which point she thought, "He [is] going to kill him, kill me." (**Id.** at 173). She then stated that [Appellant] then "raised the knife [up] over his head and I just, I blocked my face with my arms." (**Id.** at 177). She then heard [the Victim] and [Appellant] "struggling" and "[b]y the time I got up, my son—I knew it had to be my son, but by the time I got up, he was gone." (**Id.** at 178). She then testified that she ran after her son, [the Victim], who was halfway down the street yelling for help. By the time [Ms.] Alexander reached her son, "he was halfway down the street and he was leaning on the neighbor's concrete wall. And he was yelling, 'Mom, I'm stabbed.'" (**Id.** at 179). [Appellant] then fled the scene in a rental car, while the EMT and Scranton Police responded to the crime scene.

(Trial Court Opinion, 3/30/17, at unnumbered pages 2-3) (some record citations omitted; record citation formatting provided).

On March 19, 2015, the jury found Appellant not guilty of criminal attempt-homicide and convicted him of the aforementioned crimes. On May 15, 2015, the court sentenced Appellant to an aggregate term of

incarceration of not less than seven and one-half nor more than fifteen years. Appellant did not file post-trial motions or a direct appeal.

On April 25, 2016, Appellant filed a *pro se* petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546, seeking leave to appeal *nunc pro tunc*. The trial court appointed counsel on May 3, 2016 and, on January 19 and 26, 2017, it entered orders reinstating Appellant's direct appeal rights *nunc pro tunc*. On January 30, 2017, Appellant timely appealed.[2]

Appellant raises two questions for our review:

> 1. Whether the trial court erred by permitting the Commonwealth to introduce Ms. Alexander's testimony of prior bad acts pursuant to Rule 404(b) over defense objections?
>
> 2. Whether the trial court abused its discretion when it excused a juror?

(Appellant's Brief, at 4) (unnecessary capitalization omitted).

In his first issue, Appellant challenges the trial court's grant of the Commonwealth's motion *in limine* seeking the admission of prior bad acts testimony pursuant to Pennsylvania Rule of Evidence 404(b). (**See id.** at 8-12). Specifically, Appellant argues that the court erred in allowing Ms. Alexander's "inflammatory and incriminating testimony" about prior domestic

---

[2] On March 1, 2017, Appellant timely filed a statement of errors complained of on appeal pursuant to the court's order. **See** Pa.R.A.P. 1925(b). The trial court filed an opinion on March 30, 2017. **See** Pa.R.A.P. 1925(a).

abuse involving Appellant because this "unfairly prejudiced [him] and the probative value was minimal." (*Id.* at 12).  Appellant's issue lacks merit.

> In evaluating the denial or grant of a motion *in limine,* our standard of review is well-settled.  When ruling on a trial court's decision to grant or deny a motion *in limine,* we apply an evidentiary abuse of discretion standard of review.  A trial court has broad discretion to determine whether evidence is admissible, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.  If the evidentiary question is purely one of law, our review is plenary.

*Commonwealth v. Gill*, 158 A.3d 719, 725 (Pa. Super. 2017) (citation omitted).

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity.  Pa.R.E. 404(b)(1).  However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident.  Pa.R.E. 404(b)(2).  In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

*Commonwealth v. Winslowe*, 158 A.3d 698, 713 (Pa. Super. 2017) (case citations omitted).  "[O]ur courts will allow evidence of prior bad acts where the distinct crime or bad act was part of a chain or sequence of events which formed the history of the case and was part of its natural development."

*Commonwealth v. Drumheller*, 808 A.2d 893, 905 (Pa. 2002), *cert. denied*, 539 U.S. 919 (2003) (citation and internal quotation marks omitted).

In **Drumheller**, the trial court granted the Commonwealth's motion *in limine* seeking to introduce prior bad act evidence that consisted of four protection from abuse orders (PFAs) filed by the murdered victim against the defendant over the previous thirty-four months. **See id.** at 901. In concluding that the trial court properly exercised its discretion, the Pennsylvania Supreme Court stated:

> In the present case, the evidence suggests that the abuse by [the defendant] of [the victim] continued during this entire three-year period. All four PFA petitions are relevant to demonstrate what the Commonwealth accurately characterizes as "the continual and escalating nature of [defendant's] abuse of [the victim]." The challenged evidence shows the chain or sequence of events that formed the history of the case, is part of the natural development of the case, and demonstrates [the defendant's] motive, malice, intent, and ill-will toward [the victim].

**Id.** at 905 (record citation omitted).

Similarly, in this case, the Commonwealth sought to admit Ms. Alexander's testimony regarding a PFA and several incidents of domestic violence that occurred approximately six months' prior to the June 11, 2014 incident "to show [Appellant's] ill[-]will, motive, intent, and malice in committing the current criminal charges" and "to demonstrate a chain and sequence of events which form the history of this case[.]" (Commonwealth's Motion *in Limine*, 2/23/15, at 4; **see id.** at 2-4). These incidents included Ms. Alexander's waking up in the middle of the night with Appellant holding a butcher knife to her neck and "ranting and raving" because he believed she was cheating on him. (**See** N.T. Trial, 3/17/15, at 138; **see id.** at 137).

- 6 -

On another occasion, Appellant crashed into her vehicle with her inside it several times, disabling the vehicle, and eventually forcefully yanking her out of the car because she had just dropped off two male friends. (*See id.* at 223-24). Also, Appellant started tracking Ms. Alexander on her cell phone, and appearing in an agitated state wherever she was. (*Id.* at 147-51). In spite of her fear of Appellant's retribution, Ms. Alexander obtained a PFA against him pursuant to an attorney's advice, which excluded him from her home. (*See id.* at 153, 157). Thereafter, Ms. Alexander was at home when Appellant entered, swinging a machete at her, and slicing her sweatpants. (*See id.* at 159, 166). In another incident, Appellant tried to suffocate Ms. Alexander. (*Id.* at 167-68).

> The trial court granted the Commonwealth's motion, finding that:
>
> Similarly to **Drumheller**, this [c]ourt found that [Appellant's] prior incidents of abuse were admitted pursuant to [R]ule 404(b) because "they help the Commonwealth establish malice, intent, and ill will toward the victim" and "that it is part of a connected series or chain of events that led up to the June 11[th] event." (N.T. Trial, 3/17/15, at 14). Therefore, since these prior incidents of abuse are more probative than prejudicial, [the court] found that they [were] admissible at trial.

(Trial Ct. Op., at unnumbered page 6) (record citation format provided). We agree.

Additionally, we observe that, at trial, the court gave cautionary instructions to the jury three times during Ms. Alexander's testimony, and once during its closing charge. Before Ms. Alexander testified to the prior bad acts, the court advised the jury that the testimony was to be used only

for the limited purpose of showing malice, ill-will, motive, or a chain or sequence of events leading up to the incident in question, not as evidence that Appellant was a person of bad character. (**See** N.T. Trial, 3/17/15, at 136-37). Also, the court explained that the PFA was entered against Appellant without any admission of wrongdoing, and advised that the jury members were to consider this evidence for the limited purpose of showing the chain or sequence of events. (**See id.** at 152-53). Next, the court instructed the jury regarding testimony about incidents for which Appellant was not on trial, that occurred after the entry of the PFA, and before the incident in question, reminding them of its limited purpose. (**See id.** at 158-59). Finally, in its closing charge, the court repeated that the prior bad acts evidence was admitted for a limited purpose; and not to show that Appellant is a person of bad character, or that he has criminal tendencies from which they might be inclined to infer guilt. (**See** N.T. Trial, 3/19/15, at 79-80).

"The law presumes that the jury will follow the instructions of the court." **Drumheller**, **supra** at 906 (citations omitted). Here, the court informed the jury of the limited use of the evidence of Appellant's prior abuse of Ms. Alexander, namely that it could only be used to demonstrate the chain or sequence of events that formed the history of the case and Appellant's motive, malice, intent, and ill-will. Because the prior incidents of domestic abuse and the facts that formed the basis for the PFA formed the chain and sequence of events leading up to the June 11, 2014 crime, and

the trial court provided cautionary instructions, we conclude that it did not abuse its discretion in admitting the Commonwealth's Rule 404(b) evidence. *See Gill*, *supra* at 725. Appellant's first issue does not merit relief.

In his second claim, Appellant argues that "[t]he trial court abused its discretion by excusing a seated juror." (Appellant's Brief, at 12). We disagree.

"The discharge of a juror is within the sound discretion of the trial court. Absent a palpable abuse of that discretion, the court's determination will not be reversed." *Commonwealth v. Treiber*, 874 A.2d 26, 31 (Pa. 2005) (citation omitted). "Alternate jurors . . . shall replace principal jurors who become unable or disqualified to perform their duties." Pa.R.Crim.P. 645(A).

Instantly, the trial court describes the pertinent background of this matter as follows:

> . . . [V]oir dire and jury selection took place on March 16, 2015. After the selection of the jury, the members of the panel were advised that [trial] would reconvene one (1) day later and commence [] on March 17, 2015. When trial reconvened the next day, [the trial court] raised a concern about juror No. 5. [The court] thought he may have been sleeping and/or texting. The juror was then brought into the courtroom outside the presence of the remaining jurors to be questioned. . . .

(Trial Ct. Op., at unnumbered pages 6-7). The following relevant exchange occurred between the court and the juror:

> THE COURT:        . . . I brought you out here just because I had to ask you a couple of questions, okay?

JUROR:          Okay.

THE COURT:      During the course of this morning, I have an obligation to observe all of the jurors to make sure that they are . . . performing their duties and being attentive jurors, and I, at first, I thought you might have been texting on your phone, because I couldn't see your hands.

JUROR:          Oh.

THE COURT:      So I thought—because you were looking down throughout the testimony this morning at your hands.  I couldn't see your hands, so I thought, too, maybe you're writing in your notebook.

JUROR:          Okay.  Yeah.

THE COURT:      So I had a concern, and then I thought maybe you were drifting off to sleep. . . . So, were you?

JUROR:          No.

                        *     *     *

THE COURT:      Okay.  And the only other concern that I had was that I noted that when the tape was being played, a transcript was disseminated. . . . And all of the jurors read along with the transcript . . . except you. . . . Do you know why . . . you didn't read along?

                        *     *     *

JUROR:          It was just too much. . . . [I]t was too much for me to handle, I think.  I don't know.

THE COURT:      Too much information?

JUROR:          I suppose so.

THE COURT:      Do you have—[I]s there something that I need to know?  Are you having—do you have concerns?  Is there something that's concerning you or troubling you about your service here?

JUROR:        Um—

THE COURT:      And there's no wrong answer.

JUROR:        Well, I just—I guess I have moral—or I just don't—I have a moral objection to the whole thing.

THE COURT:      You have a moral objection to the whole proceeding?

JUROR:        Yeah. Yep.

(N.T. Trial, 3/17/15, at 208-11). Thereafter, Appellant's counsel questioned the juror. That exchange included, in pertinent part:

[COUNSEL]:    . . . Sir, you don't feel you could be fair and impartial even if the [j]udge instructed you that you need to be to be a juror?

JUROR:        I just have moral obligations for finding someone guilty. I'm trying to think, I just—

[COUNSEL]:    Okay.

JUROR:        I just—

[COUNSEL]:    But if the [j]udge—

JUROR:        I'm sorry.

[COUNSEL]:    That's all right. You have trouble standing in judgment of somebody else?

JUROR:        Yeah. Basically.

[COUNSEL]:    All right. If the [j]udge tells you, or has told you that in order to be a proper juror for this trial you can't have any preconceived beliefs or notions that would cause you not to be fair, is it your answer that you can't be fair?

JUROR:        I guess not.

- 11 -

(*Id.* at 214-15). Following the above questioning, the trial court excused the juror and replaced him with an alternate. (*See id.* at 218).

Based on the foregoing, where the juror stated that his moral and ethical beliefs precluded him from being able to sit in judgment in a criminal trial, the trial court properly exercised its discretion when it dismissed him "to ensure impartiality and fairness to both parties." (Trial Ct. Op., at unnumbered page 9); *see also Treiber*, *supra* at 31. Appellant's second issue lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/20/2017