J-S10040-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DERRICK WILSON MCCRAY | : | |
| | : | |
| Appellant | : | No. 2441 EDA 2018 |

Appeal from the PCRA Order Entered July 11, 2018
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0003589-2014

BEFORE: GANTMAN, P.J.E., STABILE, J., and COLINS*, J.

MEMORANDUM BY GANTMAN, P.J.E.: **FILED APRIL 09, 2019**

Appellant, Derrick Wilson McCray, appeals from the order entered in the Bucks County Court of Common Pleas, which denied his first petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1] We affirm.

The PCRA court accurately set forth the relevant facts and procedural history of this case as follows:

> On November 14, 2014, following a three-day jury trial, Appellant was convicted of Rape—Threat of Forcible Compulsion, Criminal Trespass, Indecent Assault—Threat of Forcible Compulsion, False Imprisonment, Simple Assault, and Possession of Instrument of Crime. The charges stemmed from an incident that occurred on March 18, 2014.
>
> On March 18, 2014, [Victim] resided in…Bucks County, with her parents, and her daughter. [Victim] and Appellant were married in 2012 and had a daughter in August 2013.

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

---

\* Retired Senior Judge assigned to the Superior Court.

However, in December 2013, [Victim] moved out and filed for divorce. She stated that even though she wanted a divorce, she and Appellant continued to communicate in an attempt to co-parent their daughter.

[Victim] typically worked from home…. Her job also entailed conducting on site interviews for compliance with background checks. On March 18, 2014, [Victim] had five interviews scheduled and had to dress professionally that day. Around 6:30 a.m., she dropped her daughter off at daycare and then returned home to get ready for work.

While she was upstairs getting ready, [Victim] stated that she heard a noise downstairs. She thought it may have just been the cats because both her parents had left for work. After she finished getting ready, [Victim] began to walk downstairs. Appellant was standing at the bottom of the stairs with a knife in his hand and pointed it towards [Victim's] chest. Appellant told [Victim] that he did not want to hurt her, told her to turn around and go back upstairs to her bedroom.

Appellant followed her to her bedroom and instructed [Victim] to take off her clothes. As she began to comply, she stated that she did not want to do this. Appellant put the knife to one of her blouse buttons, flicked the button, and instructed her to do what he said and she would make it out alive. After [Victim] undressed, Appellant instructed her to turn around and bend over. He then put his penis in her vagina. After a few minutes, he had [Victim] turn around and get on her knees, and then he ejaculated onto her face. [Victim] asked for Appellant to get her a tissue, which she used to wipe off her face, and asked to get dressed.

[Victim] remained in fear that Appellant might continue to harm her so she began to talk about their daughter. She also gave him a picture of their daughter that was on her bedroom mirror. While talking, Appellant told [Victim] that he got the knife from a friend's house and had entered the house through the basement window in the laundry room. Appellant also stated that he was working and living with his girlfriend in …, PA. [Victim] stated that Appellant was wearing a tan cartwright hat, gray hoodie that had fur

around the hood, light gray jeans, and blue gloves. [Victim] persuaded Appellant to leave before her parents returned home. As Appellant was leaving, [Victim] let him take a water bottle that was on the kitchen table and she also saw him grab a black bag off the recliner. After Appellant left, she called 911 to report the incident.

…Police responded to the scene and [Victim] agreed to be transported to the …Hospital for a SANE exam. [Victim] was then transported to the…Police Department to provide her statement.

During the investigation on March 18, 2014, the…police searched [Victim's] parents' house for evidence. They collected a tissue on the dresser that [Victim] stated she used to wipe her face, and also swabbed for fingerprints. Later that afternoon, the police contacted Appellant and he agreed to come to the station for questioning. Appellant also consented to a search of his vehicle and his girlfriend's house. In the car, the police found a water bottle, knives, and the picture of the daughter of Appellant and [V]ictim. After searching Appellant's girlfriend's house, the police did not find the sweater, hoodie with fur around the collar, jeans, or black bag that [V]ictim described.

At trial, the Commonwealth and Appellant stipulated to the fact that as part of the evidence the police collected, a tissue from the bedroom dresser contained spermatozoa that matched the DNA of [Appellant]. No DNA was detected for all other items that were tested: jeans found at Appellant's girlfriend's house, a knife found in Appellant's car, a swab from the basement window at [Victim's] parents' house, and a swab from a glass patio.

Appellant testified during trial that the incident on March 18, 2014, was arranged and consensual. Appellant testified that [Victim] agreed to let Appellant meet her at their daughter's daycare so Appellant could see his daughter for a few minutes. After [Victim] took their daughter into daycare, Appellant stated that he needed to talk to [Victim] about a few things, and they agreed to go back to her parents' house. Appellant testified that he and [Victim] had consensual sex, and he entered the house through the front door. Appellant testified he left because [Victim] was

concerned her parents might return home from work. Appellant then testified he went back to his girlfriend's house and told his girlfriend where he went that morning.

Later that afternoon, the police called Appellant because they had a concern regarding [Victim]. Appellant agreed to go to the police station and his girlfriend accompanied him. At first, Appellant lied to the police, stating that he did not see [Victim] that day because he knew that he was not supposed to have contact with her. After the police told him that they knew he had contact with her, broke into her house and raped her with a knife, Appellant then spoke to the police. He testified that he told the police that [Victim] willingly arranged to meet him at their daughter's daycare, they went back to her house where she let him in through the front door, and they had consensual sex.

[G.M.], Appellant's girlfriend at the time of the incident, testified that Appellant had been staying at her house and got up early on March 18, 2014, to go to work. [G.M.] testified that Appellant returned home around 7:40 a.m. and told her that he was not needed for work, so he cleaned his car. The police contacted [G.M.] in an attempt to reach Appellant, and she put Appellant on the phone and then accompanied Appellant to the police station. The police indicated to [G.M.] that they were looking for a black bag. She stated that she did not know anything about it. [G.M.] also stated that the first time she saw the picture of Appellant's daughter was on March 18, 2014—the same day [V]ictim testified to giving it to Appellant.

A few days later, [G.M.] then contacted the police regarding a black bag found in her house. [G.M.]'s grandfather who also resides with her, testified that at the end of March 2014, while he was doing laundry, he knocked something behind the washing machine. After moving the machine out, [G.M.'s grandfather] found a white plastic bag containing clothes hidden behind the dryer and sitting on top of the dryer vent hose. [He] stated that he thought nothing about it because his grandchildren have a habit of dropping their stuff off to be washed and stuff does get knocked off. [G.M.'s grandfather] testified that he dumped the clothing out of the bag into the washer and there was a "jacket with a hood, fur, and a pair of jeans." [He] washed

- 4 -

the clothing because he thought they were his grandson's clothes.

[G.M.'s grandfather] contacted [G.M.] when he also noticed a black satchel fall out of the white bag. [G.M.] contacted the police who came to the house to collect the items. Appellant testified that he believed that [G.M.] lied when she testified that Appellant told her he had work the morning of March 18, 2014, and returned by 7:40 a.m. because he wasn't needed. In addition, Appellant believes that someone, most likely [G.M.], put the clothes behind the washer and dryer to get him.

[O]n March 18, 2014, Appellant had a no contact order with [V]ictim. This no contact order and temporary Protection from Abuse Order arose from an incident that occurred on February 14, 2014.

On February 14, 2014, [Victim] agreed to help Appellant pay the bill for his phone. They arranged to meet at their old apartment where Appellant was still living. Appellant wanted to spend some time with [Victim], and she agreed to work from the [a]partment that day. Both Appellant and [Victim] testified that they communicated after [Victim] moved out and filed for divorce. On February 14, 2014, Appellant and [Victim] were in communication and Appellant left to run some errands. [Victim] left the apartment that afternoon but soon returned to retrieve the cat litter she had left there.

Appellant was in the apartment when [Victim] returned to get the bags. He asked [Victim] to spend more time with him so they could work things out and not get a divorce. [Victim] stated, "No, I can't. I have to go" and began to walk around Appellant to leave. As she walked by, Appellant wrapped his arm around her throat, covered her nose and mouth with his other hand, and threw her to the ground. Appellant straddled [Victim] and stated that she was not going to leave him, he was not going to let her leave, and that she could not leave him. [Victim] was able to get Appellant's hands off her face to breathe and was able to get halfway up off the ground.

However, Appellant again wrapped his arm around her

- 5 -

throat, covered her nose and mouth, and dragged her down the hallway into the bathroom. After [Victim] was able to breathe again, she was able to convince Appellant to let her go and not hurt her. [Victim] then began to leave the room and walked down the hallway, but Appellant, for a third time, grabbed her from behind and dragged her into the bedroom. [Victim] begged [Appellant] to let her go and stated that she would not call the cops. [Victim] also told Appellant that she needed to get their daughter from daycare and would bring her back so they could be a family.

[Victim] was then able to leave, drive to a nearby parking lot, and call 911. [Victim] spoke to the police, filed a report, and her neck bruises were photographed. Appellant was criminally charged with assaulting [Victim] during this incident. The Montgomery County Court of Common Pleas entered a temporary Protection from Abuse Order, where Appellant was ordered not to have contact with [Victim]. In order to have bail set, Appellant had to abide by the no contact order. This no contact order and temporary PFA were in effect at the time of the March 18, 2014 incident that was prosecuted within Bucks County.

\* \* \*

For the criminal charges that arose in Bucks County [regarding the March 18, 2014 incident], Appellant was convicted by a jury. He was represented by [the] Bucks County Public Defender…during pre-trial motions, trial, sentencing, and the filing of post-sentence motions. … Appellant was sentenced on March 23, 2015, to serve an aggregate sentence of…nine (9) to twenty-four (24) years in a state correctional institution.

Appellant subsequently filed timely Post-Sentence Motions on March 30, 2015[, which were denied by operation of law] on August 20, 2015. On September 14, 2016, the Superior Court affirmed [the judgment of sentence]. The Pennsylvania Supreme Court denied Appellant's Petition for Allowance of Appeal [on March 7, 2017. ***See Commonwealth v. McCray***, 158 A.3d 178 (Pa.Super. 2016), *appeal denied*, 641 Pa. 274, 167 A.3d 711 (2017)].

Appellant then [timely] filed his first *pro se* [PCRA] Petition

on May 30, 2017. He was appointed counsel and an amended PCRA was filed [on] November 13, 2017. New counsel entered his appearance on January 23, 2018. Appellant was permitted to file a second amended PCRA submitted April 2, 2018. [On June 19, 2018, the court issued notice of its intent to dismiss the petition without a hearing per Pa.R.Crim.P. 907. Appellant did not respond]. The PCRA petition was dismissed on July 11, 2018…. On August 7, 2018, Appellant timely filed a Notice of Appeal to the Superior Court.

(PCRA Court Opinion, filed October 22, 2018, at 1-8) (internal citations omitted). On August 10, 2018, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which Appellant timely filed on August 20, 2018.

Appellant raises three issues for our review:[2]

DID THE [PCRA] COURT ERR IN ITS DETERMINATION, WITHOUT A HEARING, THAT TRIAL COUNSEL PROVIDED TO APPELLANT EFFECTIVE REPRESENTATION AT TRIAL DESPITE THE FACT THAT TRIAL COUNSEL OFFERED NO OPPOSITION TO THE COMMONWEALTH SEEKING TO ADMIT PRIOR BAD ACTS EVIDENCE AGAINST APPELLANT AT THE TIME OF TRIAL, DID NOT REQUEST TO LIMIT THE AMOUNT OF SUCH EVIDENCE PRESENTED AGAINST APPELLANT, AND DID NOT REQUEST A CURATIVE INSTRUCTION TO THE JURY REGARDING THE PRESENTATION OF SUCH EVIDENCE?

DID THE [PCRA] COURT [ERR] IN ITS DETERMINATION WITHOUT A HEARING, THAT TRIAL COUNSEL PROVIDED TO APPELLANT EFFECTIVE REPRESENTATION, WHEN SHE FAILED TO OFFER INTO EVIDENCE THE FACT THAT THE VICTIM, APPELLANT'S WIFE, WAS INVOLVED WITH APPELLANT IN ACTIVE CUSTODY LITIGATION AND THAT THE VICTIM HAD SOUGHT AND BEEN DENIED A PRIOR PFA FROM THE MONTGOMERY COUNTY COURT, PRIOR TO THE DATE OF THE ALLEGED CRIME?

_____

[2] We have reordered Appellant's issues.

DID THE [PCRA] COURT ERR IN DENYING APPELLANT AN EVIDENTIARY HEARING PURSUANT TO THE POST CONVICTION RELIEF ACT INASMUCH AS APPELLANT HAD ISSUES MERITORIOUS OF REVIEW THAT COULD ONLY BE PROPERLY CONSIDERED FOLLOWING AN EVIDENTIARY HEARING?

(Appellant's Brief at vi).

Our standard of review of the denial of a PCRA petition is limited to examining whether the record evidence supports the court's determination and whether the court's decision is free of legal error. ***Commonwealth v. Ford***, 947 A.2d 1251 (Pa.Super. 2008), *appeal denied*, 598 Pa. 779, 959 A.2d 319 (2008). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. ***Commonwealth v. Boyd***, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). A petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact, the petitioner is not entitled to PCRA relief, and no purpose would be served by any further proceedings. ***Commonwealth v. Hardcastle***, 549 Pa. 450, 701 A.2d 541 (1997). "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." ***Commonwealth v. Cousar***, 638 Pa. 171, 188, 154 A.3d 287, 297 (2017).

For purposes of disposition, we combine Appellant's issues. Appellant argues trial counsel failed to object to the Commonwealth's introduction of "prior bad acts" evidence concerning the February 14, 2014 incident between Appellant and Victim. Appellant asserts trial counsel's failure to object eliminated the court's obligation to conduct a balancing test to decide whether the probative value of the evidence outweighed its prejudicial effect. Appellant contends that whether the evidence was admissible for an appropriate reason (*i.e.*, to demonstrate motive or intent) creates a question of material fact that must be examined at a PCRA hearing. Appellant claims trial counsel also failed to cross-examine Victim about the parties' ongoing custody litigation or Victim's prior failed attempt to obtain a PFA order against Appellant at the outset of their divorce litigation. Had trial counsel explored these issues, Appellant avers the jury would have seen that Victim had a motive to fabricate her testimony. Appellant insists his claims call into question trial counsel's strategy, which required the PCRA court to hold an evidentiary hearing. Appellant concludes he raised colorable claims of trial counsel's ineffectiveness, and this Court must remand for an evidentiary hearing. We disagree.

The law presumes counsel has rendered effective assistance. ***Commonwealth v. Gonzalez***, 858 A.2d 1219, 1222 (Pa.Super. 2004), *appeal denied*, 582 Pa. 695, 871 A.2d 189 (2005). To prevail on a claim of ineffective assistance of counsel, a petitioner must show, by a preponderance

of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Turetsky*, 925 A.2d 876 (Pa.Super. 2007), *appeal denied*, 596 Pa. 707, 940 A.2d 365 (2007).  The petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable strategic basis for her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.  *Id.* at 880.  "The petitioner bears the burden of proving all three prongs of the test."  *Id.*  Importantly, "PCRA hearings are not discovery expeditions, but are conducted when necessary to offer the petitioner an opportunity to prove his explicit assertion of ineffectiveness raising a colorable claim about which there remains an issue of material fact."  *Cousar, supra* at 192, 154 A.3d at 299.  Thus, "if the record reflects that the underlying issue is of no arguable merit or no prejudice resulted, no evidentiary hearing is required."  *Commonwealth v. Bauhammers*, 625 Pa. 354, 385, 92 A.3d 708, 726-27 (2014).

Pennsylvania Rule of Evidence 404(b) provides as follows:

**Rule 404.  Character Evidence; Crimes or Other Acts**

\*     \*     \*

**(b)   Crimes, Wrongs or Other Acts.**

*(1)   Prohibited Uses.*  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order

to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

\* \* \*

Pa.R.E. 404(b)(1)-(2). In other words, evidence of other crimes or bad acts is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501 (2005), *cert. denied*, 549 U.S. 848, 127 S.Ct. 101, 166 L.Ed.2d 82 (2006). Additionally, "our courts will allow evidence of prior bad acts where the distinct crime or bad act was part of a chain or sequence of events which formed the history of the case and was part of its natural development." *Commonwealth v. Drumheller*, 570 Pa. 117, 137, 808 A.2d 893, 905 (2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (holding admission of victim's prior PFA petitions against appellant was proper to demonstrate continual and escalating nature of appellant's abuse of victim).

When offered for a legitimate purpose, evidence of prior crimes or bad acts is admissible if its probative value outweighs its potential for unfair prejudice. *Commonwealth v. Hairston*, 624 Pa. 143, 84 A.3d 657 (2014), *cert. denied*, ____ U.S. ____, 135 S.Ct. 164, 190 L.Ed.2d 118 (2014). "'[U]nfair

prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." ***Id.*** at 159, 84 A.3d at 666 (quoting Pa.R.E. 403, *Comment*).

> Evidence will not be prohibited merely because it is harmful to the defendant. This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. Moreover, we have upheld the admission of other crimes evidence, when relevant, even where the details of the other crime were extremely grotesque and highly prejudicial.

***Commonwealth v. Tyson***, 119 A.3d 353, 360 (Pa.Super. 2015) (*en banc*) (internal citation omitted). "Additionally, when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence. … Jurors are presumed to follow the trial court's instructions." ***Hairston, supra*** at 160, 84 A.3d at 666.

Instantly, the PCRA court addressed Appellant's claims as follows:

> Here, Appellant asserts he should be granted relief due to ineffective assistance of counsel. This [c]ourt has declined to hold an evidentiary hearing because the [c]ourt could determine from Appellant's Second Amended Petition for Relief that Appellant has failed to overcome the presumption that counsel is effective and could not meet the three prong test.
>
> *       *       *
>
> … Appellant asserts that his trial counsel was ineffective because she allowed prior bad acts to be admitted without requesting to limit the amount of evidence presented and failed to request a jury limiting instruction. From the record, this [c]ourt determined that this claim is without merit and

Appellant did not suffer actual prejudice as a result of counsel's performance since the result would not have been different.

During the pre-trial portion of this case, the Commonwealth submitted Motions *in Limine* for the admission of Appellant's prior bad acts. The Commonwealth argued that while prior bad acts are generally not admissible they may be admitted to prove motive, intent, plan, preparation, and knowledge. It was [the Commonwealth's] argument that the February 14, 2014 allegations were admissible at trial to demonstrate intent:

> [I]t shows that [V]ictim went to extensive lengths within the law to try to keep [Appellant] from having any further contact with her and that the sexual encounter on March 18, 2014, could not in any way be considered consensual sex. This testimony shows evidence of [Appellant's] intent and knowledge, *i.e.*, that [Appellant] did not intend to engage in consensual sex with [V]ictim on March 18, 2014. The testimony about the prior incident and the PFA also show [Appellant's] motive and intent to break into [V]ictim's home to surreptitiously gain access to her as he was not permitted to have any legal contact with her. *Commonwealth's Motion in Limine to Admit Prior Bad Acts* 7/18/2014.

Appellant is correct in stating that trial counsel did not object to [the Commonwealth's] motion *in limine*. However, trial counsel's lack of objection does not rise to ineffective counsel because these prior bad acts were admissible to show intent.

Appellant does not plead or offer any legal authority that would have precluded the prior bad acts that were introduced at trial. In addition, he fails to plead or identify in what way the prior bad acts should have been limited. Essentially, Appellant has set forth a bald claim and fails to provide any argument to support the merit to his claim.

Furthermore, the prior bad acts introduced from February 14, 2014 were admissible under Pennsylvania law [to show

the chain or sequence of events that formed the history of the case].

… While trial counsel may not have asked for the limiting instruction at the pretrial motion, she did request it during the course of trial. This [c]ourt instructed the jury to consider the February 14, 2014 [incident] in a limited manner:

> You've also heard evidence presented by the Commonwealth alleging that [Appellant] assaulted [Victim] on February 14, 2014, leading to the filing of criminal charges and the entry of protection from abuse order in Montgomery County. The evidence of the February 14, 2014, incident is before you for a very limited purpose; that is, for the purpose of rebutting the defense contention that the sexual acts occurring on March 18th were consensual.
>
> This evidence must not be considered by you in any way other than for this purpose. You must not consider this evidence as showing that [Appellant] is a person of bad character, or of criminal tendencies from which you might be inclined to infer guilt. Its sole purpose for your consideration is the Commonwealth's contention that it rebuts the defense's claim of consent. (N.T. Jury Trial, 11/13/14, pp 156-57).

These instructions further support the fact that Appellant's ineffective counsel claim is meritless. Even if Appellant's claim [had arguable merit], he would fail to satisfy the third prong of the test that the result would have been different.

It is clear that trial counsel did ask for a limiting instruction regarding the prior bad acts from February 14, 2014, and that the jury was instructed by this [c]ourt to use those acts for a very limited purpose. With these limiting instructions, Appellant was still found guilty. Therefore, Appellant cannot prove that counsel's action or inaction resulted in a prejudicial outcome. Appellant's failure to satisfy prongs one and three of the ineffective assistance test results in his claim being dismissed.

- 14 -

* * *

Appellant [also] asserts [that] trial counsel was ineffective when she failed to admit evidence of the custody litigation between [V]ictim and Appellant. It is Appellant's belief that the custody litigation serves as an explanation as to why [V]ictim would fabricate criminal allegations against Appellant. …

While trial counsel may not have introduced the history of the divorce and custody proceedings, the jury heard this evidence during direct examination of [V]ictim. In addition, on direct examination trial counsel fully explored Appellant's versions of the February 14 and March 18, 2014 incidents.

During Appellant's testimony, trial counsel elicited from Appellant details regarding their marriage and the roller coaster of intimacy and jealousy. Furthermore, it was elicited from Appellant that he believed [V]ictim fabricated the February 14 and March 18, 2014 incidents to keep him from his daughter. However, Appellant contradicted his own theory by stating [V]ictim did not deny his access to his daughter, and he was permitted to visit their child. The evidence elicited at trial would discredit or negate any impeachment that could have been derived from the custody litigation. As such, Appellant's claim for ineffective counsel is meritless.

Appellant also argues that counsel should have offered into evidence that [V]ictim had been denied a prior PFA request from Montgomery County Court prior to the March 18, 2014 [incident]. The only evidence of the prior PFA request is the docket entry Appellant attached. The docket shows that [Victim] filed for a PFA on December 19, 2013. On that same day, the temporary order was denied and the PFA *praecipe* to withdraw was submitted. Appellant pleads no other facts besides "the victim had filed for Protection from Abuse on December 19, 2013…but that request for protection was denied." It is Appellant's contention that trial counsel should have introduced evidence of the withdrawn PFA as an explanation for why [V]ictim would fabricate criminal allegations.

This [c]ourt sees no merit in Appellant's argument. In

- 15 -

addition, even if this argument had [arguable] merit, Appellant could not satisfy the third prong prejudice requirement of the ineffective assistance of counsel test. There is not a reasonable probability that the result would have been different if trial counsel had elicited that [V]ictim had withdrawn her December PFA petition. The jury was able to hear from both [V]ictim and Appellant. They were made aware of both sides of the story regarding the February and March allegations. In addition, Appellant conveyed quite strongly that [V]ictim was jealous of his current girlfriend he was living with and did not want "females" around their daughter.

If the jury was to believe that [V]ictim had fabricated the criminal allegations, there was sufficient testimony for the jury to do so. They jury chose to find [V]ictim more credible [than] Appellant and there is [no] reasonable probability that [the jury's] decision would have been impacted by additional testimony regarding the withdrawn PFA petition.

Appellant has failed to meet his burden to overcome the presumption that trial counsel was ineffective. For this specific claim, he has failed to demonstrate there is [arguable] merit. In addition, even if this [c]ourt believes the claim had merit, Appellant has failed to satisfy prong three of the test. Based on the PCRA petition and the exhibits, there is not a reasonable probability that trial counsel's decision to omit the PFA impacted the result of the trial. As such, Appellant has not been prejudiced.

(PCRA Court Opinion at 11-16) (some internal citations omitted). The record supports the court's analysis. *See Ford, supra*. Appellant's ineffectiveness claims lacked arguable merit and prejudice, so the PCRA court properly declined to hold an evidentiary hearing. *See Cousar, supra*; *Bauhammers, supra*. Accordingly, we affirm.

Order affirmed.

- 16 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/19