J-A19042-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                     :  PENNSYLVANIA
                                     :
           v.                        :
                                     :
                                   :
RICHARD BEENER, SR.          :
                                   :
          Appellant         :  No. 1993 EDA 2022

Appeal from the Judgment of Sentence Entered May 26, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0000814-2019

BEFORE:  BOWES, J., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:        **FILED OCTOBER 17, 2023**

Richard Beener, Sr. (Beener) appeals from the judgment of sentence imposed in the Court of Common Pleas of Montgomery County (trial court) after his bench conviction of two counts of rape of a child, 18 Pa.C.S. § 3121(c), and related charges.[1]  He raises several challenges, including the weight of the evidence, the trial court's grant of the Commonwealth's motion to admit prior bad acts evidence, denial of his motion to admit evidence in an

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The related charges included two counts of involuntary deviate sexual intercourse, 18 Pa.C.S. § 3123(a); one count each of aggravated indecent assault of a person less than 13 years of age, 18 Pa.C.S. § 3125(b), and corruption of minors, 18 Pa.C.S. § 6301(a)(1); and three counts each of indecent assault, person below age of 13, 18 Pa.C.S. § 3126(a)(7), and indecent exposure, 18 Pa.C.S. § 3127(a).

unrelated matter in Chester County, and his post-trial motion for a new trial based on newly-discovered evidence. We affirm.

**I.**

**A.**

The trial court set forth the background facts in its January 3, 2023 opinion, as follows:

> In the early morning hours of September 21, 2018, [Victim], then 21 years old, was out with her friends Esmeralda Delgado and Trevor Young at Prima Motel and Lounge in Phoenixville, Pennsylvania, when she encountered [Beener], her uncle by marriage, at the bar. [Victim] had gone up to the bar to pay her tab and stood next to her uncle. When [Beener] touched her, she fled outside crying. Once outside, [Victim] told Trevor to go get him, "go beat him up." (N.T. Trial, 2/01/22, at 73). As the memories came rushing back, she explained to her friend that "Uncle Ricky" had molested her as a child. (***Id.*** at 73, 76, 79, 152). [Victim] then called her parents and told them that her uncle had molested her when she was younger, as both her mother and father had previously suspected.
>
> [Victim's] father, Joseph Morgan, drove to Prima, picked up his daughter and drove her to the Phoenixville Police station so that [Victim] could report the abuse. Mr. Morgan described his daughter as crying and shaking when he picked her up and relayed that she kept saying to him "you were right the whole time." (***Id.*** at 142-143). Patrol Officer Brad Dobry from the Phoenixville Police Department met [Victim] and her father at the police station to take a basic summary of their statements at 2:33 a.m. on September 21, 2018. Officer Dobry "took [Victim] as being credible and truthful when she came in that day." (N.T. Trial, 2/02/22, at 9).
>
> [Victim] returned to the Phoenixville Police station on Monday, September 24, 2018, for an interview with Corporal Nick Natale. [Victim] disclosed to Corporal Natale that she had previously told her girlfriend Esmeralda Delgado about the abuse and that her friend Megan True was a witness to at least one of the incidents. Once Corporal Natale determined where the

majority of the alleged assaults occurred, he informed [Victim] that the investigation would be turned over to the Upper Providence Township Police Department.

Detective Shea S. Johnson of the Upper Providence Township Police Department interviewed [Victim] on September 24, 2018, Megan True on September 27, 2018, Pamela Evans, [Victim's] mother, on October 22, 2018, and Mr. Morgan on November 29, 2018. On January 8, 2019, Detective Johnson filed a Criminal Complaint with an Affidavit of Probable Cause for the arrest of [Beener] and arrested [him] on the same day. In that affidavit, Detective Johnson summarized incidents that occurred many times from 2003 to 2009, as well as some of the incidents [Victim] could specifically remember, including the first when she was approximately six (6). years of age that occurred in [Beener]'s bedroom in the bed that he shared with his wife, another when she was approximately eleven (11) years old and was with a friend in the bathtub after the pair had gone swimming when [Beener] entered the bathroom and touched the girls with balloons, and another in 2007 that occurred at an open house when [Beener] blew up balloons and began masturbating in front of [Victim] until another person started walking toward them. (Criminal Complaint Affidavit of Probable Cause for the arrest of [Beener] filed 1/8/19; N.T. Commonwealth's Motion to Admit Evidence of Prior Bad Acts 6/29/21, at 3-4 Exhibit C-1).

(Trial Court Opinion, 1/03/23, at 2-5); (most record citations omitted; some record citation formatting provided).

**B.**

On July 12, 2019, the Commonwealth filed an information charging Beener with the foregoing crimes. On June 2, 2021, the Commonwealth filed a motion to introduce evidence of prior bad acts in which it sought to introduce evidence of subsequent charges filed against Beener for indecent assault and lewdness. The charges related to an incident in which Beener exposed himself and masturbated in the doorway of his residence in front of a five-year-old

neighbor in June 2014. In that case, Beener claimed that he was only trying to give the girl a balloon.

At the June 29, 2021 hearing on the motion, the Commonwealth stated that it sought to admit the evidence pursuant to Rule 404(b)(2)[2] as evidence of a common scheme or design and intent. (*See* N.T. Hearing, 6/29/21, at 4). Emily DeAngelo, the mother of the child, testified that she and her daughter lived next door to the Beeners during the relevant time period. She explained that "[Beener] would try to engage with my daughter and give her balloons, call her over to his home to—he would be standing at the door with a balloon. 'Hey, Mia, I have a balloon for you, come get a balloon.'" (*Id.* at 7). Ms. DeAngelo and her mother both asked Beener not to invite Mia over for a balloon unaccompanied, but he continued to do so. She testified that in addition to witnessing Beener masturbating against his glass or plastic storm door in front of her daughter and claiming he was just trying to give her daughter a balloon, Beener had given Mia balloons on a weekly basis and more frequently as it got closer to the June 2014 incident. In the litigation that followed, Beener pleaded guilty to a charge of indecent exposure to someone under the age of 18, a misdemeanor of the second degree.

---

[2] Evidence of other crimes, wrongs or acts "may be admissible for [the] purpose [of] proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

The Commonwealth argued there were significant similarities between the 2014 case and the instant matter. Specifically, "1) the age of the victims at the time of the offense, 2) the unique nature of the alleged offenses, including Beener exposing his penis and masturbating in front of young girls in or near his home, and 3) the use of or reference to balloons." (Trial Ct. Op., at 7) (citing N.T., 6/29/21, at 20-21, 23-28; Commonwealth's Rule 404(b) Motion, at ¶ 11). The trial court granted the Commonwealth's motion the same day. (***See*** Order, 6/29/21).

**C.**

On January 14, 2022,[3] Beener filed a motion *in limine* to introduce an unrelated December 2014 Chester County police report in which the Victim in this case reported being sexually assaulted in Phoenixville. (***See*** Beener's Motion *in Limine* to Introduce Police Reports, 1/14/22, at ¶ 1). The motion alleged that the Chester County defendant pled guilty to the charge of corruption of minors on a different factual basis than that reported by the Victim. (***See id.*** at ¶¶ 2-3). At argument, Beener's counsel maintained that the police reports reflect that the Victim made a false statement about her age on Facebook and about sending text messages to the Chester County

---

[3] On July 7, 2021, Beener entered an open guilty plea and sentencing was deferred pending the preparation of a pre-sentence investigative report (PSI). Beener's new (present) counsel filed a motion to withdraw the plea that the court granted on November 17, 2021.

- 5 -

defendant in the days prior to the alleged sexual offense. Beener's counsel argued that the Chester County police report should be introduced into evidence because it goes to the Victim's credibility in this matter. Defense counsel did not explain how the narrative summaries in the reports were exculpatory in this matter or how they related to Beener's defense, other than as a general attack on the Victim's credibility. The court denied the motion the same day.[4]

**D.**

Trial commenced on February 1, 2022, at which time Beener was colloquied about his decision to waive his right to a jury trial and proceed with a bench trial. Thereafter, the Commonwealth presented the testimony of (1) Ms. DeAngelo[5] (mother of the 2014 victim); (2) Esmerelda Delgado; (3) the Victim; (4) Joseph Morgan (the Victim's father); (5) Trevor Young; and (6) Phoenixville Borough Police Officer Brad Dobry.

---

[4] Also that day, the trial court issued orders granting Beener's motion to preclude the Commonwealth's "blind expert," motion to compel discovery and motion *in limine* to preclude Beener's statement and the contents of the PSI generated after his withdrawn guilty plea. It also granted the Commonwealth's motion to amend the information because it originally stated incorrectly that the crimes occurred on December 31, 2009, when they occurred between 2003 and December 31, 2009.

[5] Ms. DeAngelo testified consistently with her testimony at the hearing on the Commonwealth's motion to admit Rule 404(b) evidence. (*See* N.T. Trial, 2/01/22, at 23-32).

**1.**

The Victim[6] explained that she spent a lot of time at her aunt and uncle's (the Beener's) residence when growing up due to the circumstances in her own home. She explained that she loved her Aunt Kelly very much and they did a lot of activities together. Her aunt and cousin, Gregory Beener, were not always nearby when she was at the Beener house because her aunt would go to work, go downstairs to cook or do the dishes, or go next door to see her friend. She said that Beener did fun things with her such as baseball, board games, playing the guitar and swimming and he bought her a lot of gifts for holidays. She went on a fun family cruise with the Beeners.

When describing the details of the sexual assaults and rape, the trial court found the Victim "presented herself as an unsophisticated and very credible and courageous witness, providing clear testimony about all the events and the lurid details beginning as a little girl." (Trial Ct. Op., at 25) (citing N.T. Sentencing, 5/26/22, at 28). The court describes:

> [Victim] testified that the first time Uncle Ricky touched her inappropriately that she can remember occurred when she was six years old. She described how she was lying in the Beener's bed in between her aunt on her right and Uncle Ricky on her left while they were watching a movie entitled "Spirit", when her aunt fell asleep. That's when she could feel her uncle's hand under her clothes touching her vagina and moving his fingers up and down. Although his fingers did not go inside her vagina, she testified that they went around it and everywhere else. Specifically, she

---

[6] The Victim was 25 years old at the time of trial.

testified that his hands went between the lips of her vagina. She was shocked and scared and did not tell anyone at the time.

[Victim] could not remember the specific order in which the assaults occurred, but she testified that she remembers everything that her uncle did to her. She testified in detail about several instances with her uncle that would happen before her uncle took her home. She described how he would say "I got something for you" as they were walking out to the car, and take her into the garage where he made her sit on a white chair. He would take out his penis and make [Morgan] hold his testicles while he masturbated until he ejaculated into a napkin. (N.T., 2/01/22, at 49-50, 63). His code phrases to [her] were "are you coming up" to get her in his bedroom, and "let's fix it." (*Id.* at 58, 61, 91-92, 116). [She] described how they would start with a board game or watch part of a movie and he would look at her with "puppy dog eyes" and say "please come on, [Victim]." (*Id.* at 116-17).

She testified that on other occasions when [she] was in the pool, [Beener] would blow up balloons and throw them in the pool, get in himself, remove his pants, chase her around in the pool, and then laugh when she swam away. On another occasion, [Victim] and her friend Megan got out of the Beener pool and went into the Jacuzzi tub to wash off the chlorine when [Beener] came in with balloons and tried to touch the girls with them. [Victim] described the balloons as long, like the ones they use to make balloon animals. [Victim] also described an incident at an open house that [Beener] took her to because she had always said she wanted to move into that house when she was little. As [Victim] and [Beener] were walking around in the house, [Beener] found balloons in a cabinet in the laundry room and started to take his penis out of his pants while he was blowing one up, when they heard someone else nearby in the house and [Beener] quickly stopped what he was doing.

Another time when Megan was there and the two of them were watching television, [Victim] testified that her uncle walked in front of the TV in pajama bottoms [that] were unbuttoned and did jumping jacks until his penis fell out, and then he laughed. Another day when she was around nine (9) or ten (10), [Beener] told [Victim] that he had something for her in the garage and he pulled out a strawberry flavored condom, put it on and said "this

is how a condom works." (*Id.* at 54). [Beener] then asked if he could stick "it" in her, but she said no. (*Id.*).

Because her aunt had trouble driving at night, sometimes [Beener] would drive [Victim] home. She explained how, when she was nine (9) or ten (10), [Beener] would take his penis out of his pants and would lean over and try to touch [her] vagina while stopped at a red light or stop sign. [Victim] also testified about how [Beener] would give her quarters and $20 bills, and tell her not to tell anyone about this. She explained that she was scared and shocked and did not know whether [Beener] might hurt her "in a different kind of way if [she] told" anyone what [he] was doing to her. (*Id.* at 55).

[Victim] also testified about other times when she and [Beener] were in his and her aunt's bedroom watching her favorite movie "Jaws" and [Beener] would turn on a VHS tape of pornography "out of nowhere" and masturbate. (*Id.* at 56-57). [She] testified about how a couple of times in the garage either [Beener] took off her pants or asked her to do it, and then touched her butt and her vagina with his penis. She described his poking her with his penis by the crack of her butt and everywhere around her vagina. She explained that his penis did not enter her vaginal canal but poked by the lips, around it, and on top. [Beener] also put his penis in [Victim]'s mouth several times while he masturbated.

[Victim] testified that on numerous occasions [Beener] would take her in the garage and do fun things with her like play guitar or work on his old car before he would do the "bad stuff". (*Id.* at 62-63). From photographs taken by law enforcement, [Victim] identified the white chair [Beener] made her sit on in the garage while he performed the "bad stuff." (*Id.* at 65-66; Photographs, Commonwealth Exhibits C-2, 3, 4).

(Trial Ct. Op., at 12-16) (most record citations omitted; some record citation formatting provided).

When she was 12 years old the Victim stopped regularly going to the Beeners' home because she was old enough to stay home alone and did not want Beener to do things to her anymore. Although she conceded that she

occasionally called him for rides when she was older, she explained she would sit in the back seat. She testified that she enjoyed going over for dinners with her aunt and cousin when her uncle was upstairs. The Victim said how upset she is that she and her aunt are no longer close since she came forward about Beener's actions and explained that she contacted a television show to tell her story because she wanted her aunt to believe her.

Sometime in 2016, when she was approximately 19 years old, she told Delgado about the things Beener had done to her, begging her not to tell anyone else because she was scared, although she could not explain why. The Victim testified that she did not ask Delgado to give a statement on her behalf or tell her what to say.

The first time the Victim told anyone other than Delgado about the abuse was after the September 21, 2018 incident when she told Young, her parents and the police. Although she did not tell Young everything at first, she eventually wrote it all down for him because she expresses herself better in writing. She explained that she keeps things to herself and was angry with herself for not saying anything sooner.

**2.**

Delgado testified that she and the Victim became friends when Delgado was 14 years old, that their relationship became romantic, but that they are no longer on speaking terms because they grew apart. Sometime in 2015, when Delgado was about 16 years' old, the Victim told her that Beener had

molested her when she was a child. The molestation examples provided by Delgado were consistent with what the Victim told police. Delgado explained that the Victim was afraid her aunt would disown her so she only told Delgado bits of information about the molestation over time.

After Beener touched the Victim at Prima on September 21, 2018, Delgado said the Victim was upset, crying and kind of hysterical. Delgado and the Victim agreed that it was time she told people about what Beener had done because the Victim's brother had a baby daughter and she did not want the same things happening to her. Although the Victim drove Delgado to the police station, she did not really want Delgado to give a statement and did not tell her what to say. However, Delgado believed it was a good idea for her to give a statement since the Victim previously had told her about it, and she did it on her own terms and truthfully.

**3.**

Joseph Morgan testified that Beener's wife, Kelly, is his sister and that he has known Beener since the two got married 40 years ago. He testified that his daughter changed during the period when she spent so much time at the Beener's home, including not wanting to attend school, disliking men, being withdrawn and having a fit when her parents went to bed together. When the Victim would come home from the Beeners' home with money, she would tell her father it was from Beener, but that she did not know why he

gave it to her. When Mr. Morgan would ask his daughter if Beener ever touched her inappropriately, she denied it.

Mr. Morgan testified that when he picked her up in Phoenixville in the early morning of September 21, 2018, to take her to the police department to report the abuse, the Victim was upset, crying and shaking. Finally, he explained that the Victim loved his sister, her Aunt Kelly, very much and that she was like a mom to her, but that his sister no longer speaks to them.

**4.**

Young testified that he has known the Victim since they were 13 years old and that she now is his girlfriend. He first learned of Beener's abuse when Beener touched the Victim at the bar on September 21, 2018. Because the Victim does not like talking about her past, it was difficult for her to tell Young the details of the abuse. (***See id.*** at 153). He testified "with certainty" that a private investigator for the defense never approached him to talk about the case. (Trial Ct. Op., at 20); (***see*** N.T. Trial, 2/01/22, at 154).[7]

_____

[7] The Commonwealth also presented the stipulation that if called to testify, Carl Hessler, a Montgomery County crime and court reporter, would testify that the Victim did not contact him and that any information he obtained and posted was from the court docket. The Commonwealth introduced stipulations about the testimony of Detective Johnson and Corporal Natale. Phoenixville Police Patrol Officer Dobry testified about the "bare summary" of the brief statement he took from the Victim after speaking with her for 15 minutes at 2:30 a.m. on September 21, 2018. The prosecutor explained the unsuccessful efforts to locate the Victim's friend Megan True.

**E.**

After the court denied the defense's motion for acquittal, Beener presented the testimony of his son, Gregory Beener, and of private investigator, Sean Hawke.

**1.**

Gregory Beener, the son of Beener and Kelly Beener, is an electrical engineer who was living with his parents from the relevant period of 2003 through 2009 and resides with them now. He testified that the Victim's father dropped her off in the mornings most weekdays and some weekends while Mr. Morgan was at work. He described the Victim as happy to be there and stated that she would go shopping with his mother, watch movies with his parents, play board games and go swimming. The Victim also would bring friends over sometimes to go swimming and eat dinner before going home.

He explained that he went to middle school, high school, started working and eventually went to college between 2000 and 2006. According to Mr. Beener, the Victim was the center of attention when she was at the house, and he believed that at least two family members were with her at all times. Mr. Beener testified that because of the stable environment offered by the Beeners, the Victim seemed more comfortable around his parents than at her own home. He stated that when the Victim would go upstairs to see his dad and watch movies, he would stay downstairs playing video games. Although his dad might have been alone in a room with the Victim, he was not alone in

the house and never for any extended period of time. Mr. Beener agreed that his father spent a lot of time in the garage working on an old car, but he insisted he could not think of a single instance when the Victim would have gone in there or had reason to go in there. He testified that he found a pornographic videotape in his parents' bedroom when he was young.

Mr. Beener believed the Victim was manipulative, always had a secondary motive, and that based on his interaction with her as she got older, she was unable to tell the truth or have a sincere conversation. For example, he described how the Victim would manipulate him to give her rides at times that were inconvenient for him and he believed the reasons she gave him were not true. In his opinion, the Victim's parents were the same way, and he could never tell whether they were telling him the truth. (***See id.*** at 62). Mr. Beener believed the Victim's allegations about being molested every day were all a lie and "absurd." (N.T. Trial, 2/02/22, at 63, 67).

He conceded that he was in school or working a lot during the relevant time period, and that he also participated in after school sports, hung out with his friends and only came home for dinner. He did not go in the bedroom to play the board games with the Victim and his father or follow them out to the car when his dad would drive her home, although he sometimes saw them from·his window. His dad kept a lot of balloons around the house and in the pool and he gave the Victim loose change. According to Mr. Beener, the Victim adored his mother and his father.

Although he was not there at the time, Mr. Beener testified that in his opinion, Ms. DeAngelo was lying about the 2014 incident with her daughter, explaining that he arrived home that day, as Ms. DeAngelo "was losing her temper about something, and [he] didn't see anything." (*Id.* at 81-82). He believes that his father only took a plea in that case to prevent further exposure. (*Id.* at 81-82).

**2.**

Defense witness Sean Hawke testified he is a self-employed private detective who has been licensed for approximately 20 years. According to Mr. Hawke, he conducted a brief interview of Young during which he did not take contemporaneous notes, and then spoke with the Victim on the front porch of her home. Mr. Hawke testified that he asked the Victim whether her uncle had ever penetrated her in any way and she said no. Although the Victim seemed to understand what penetration meant, Mr. Hawke admitted he did not explain the legal definition to her. Mr. Hawke only wrote down one phrase from his interview with the Victim and no notes from his conversation with Young. He did not take any verbatim written statements or record the interviews of either the Victim or Young. However, the Victim emailed to Mr. Hawke the memorandum she had typed up describing the abuse. Mr. Hawke testified that he had destroyed his notes shortly after Beener had pleaded guilty.

**F.**

On Monday, February 7, 2022, the trial court convicted Beener of the foregoing charges. (**See** N.T. Verdict, 2/07/22, at 2-4). The court revoked bail but deferred sentencing pending a presentence investigation report and a PPI evaluation report. (**See id.** at 5). On May 26, 2022, the court sentenced Beener to an aggregate term of not less than 20 nor more than 40 years' imprisonment. After the court denied Beener's post-sentence motion, he filed a timely notice of appeal and court-ordered concise statement of errors complained of on appeal. **See** Pa.R.A.P. 1925(b).

Beener raises four issues for this Court's review: (1) whether the trial court erred in denying his post-sentence motion based on after-discovered evidence; (2) whether the trial court erred in denying his motion to admit the Victim's prior statements pursuant to the Rape Shield law, 18 Pa.C.S. § 3104; (3) whether the trial court erred in admitting prior bad acts evidence from 2014; and (4) whether the verdict is against the weight of the evidence. (**See** Beener's Brief, at 2-3).[8]

---

[8] The Commonwealth failed to file a brief in this matter despite being advised on May 16, 2023, that its deadline to do was June 14, 2023. On July 21, 2023, this Court notified counsel of the scheduled argument date in this matter and that "[p]arties who failed to meet filing deadlines are PRECLUDED FROM ARGUMENT." (Correspondence, 7/21/23, at 1) (emphasis in original). The Commonwealth also has failed to sign and return the acknowledgement of the argument date as requested in the same correspondence. (**See id.**).

**II.**

Beener argues that the trial court erred in denying his post-sentence motion based on after-discovered evidence where the case hinged on the Victim's testimony. He maintains that the Victim's text messages in which she says she was not raped contradicts the rape charge and conviction, thus entitling him to a new trial.[9]

A four-pronged test for after-discovered evidence provides that a defendant must prove each of the following factors by a preponderance of the evidence:

> that the evidence (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence;[10]

_____

[9] Our standard of review of a trial court's decision to grant or deny a new trial on the basis of after-discovered evidence is well settled:

> [W]e ask only if the court committed an abuse of discretion or an error of law which controlled the outcome of the case. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. If a trial court erred in its application of the law, an appellate court will correct the error.

*Commonwealth v. Padillas*, 997 A.2d 356, 361 (Pa. Super. 2010), *appeal denied*, 14 A.3d 826 (Pa. 2010) (citations and quotation marks omitted).

[10] "To obtain a new trial based on after-discovered evidence, the petitioner must explain inter alia why he could not have produced the evidence in question at or before trial by the exercise of reasonable diligence." *Padillas,* 997 A.2d at 363 (citation and brackets omitted). "[A] defendant who fails to question or investigate an obvious, available source of information, cannot later claim evidence from that source constitutes newly discovered evidence." *(Footnote Continued Next Page)*

(2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

**Commonwealth v. Felder**, 247 A.3d 14, at *17 (Pa. Super. filed Feb. 17, 2021) (citing **Padillas**, 997 A.2d at 363) (quotation marks omitted).

The trial court found that Beener did not meet that burden explaining that it reviewed the text messages screen shots and that they were consistent with the Victim's trial testimony and, therefore, even if Beener could not have obtained them prior to trial,[11] they are merely corroborative or cumulative. (**See** Trial Ct. Op., at 32-33). We discern no abuse of discretion.[12]

Private investigator Hawke testified at trial that the Victim denied penetration by Beener. (**See** N.T. Trial, 2/02/22, at 94). In fact, the Victim testified that Beener's penis did not penetrate her vaginal canal. (**See** N.T., 2/01/22, at 59). However, she described incidents in the garage when she stated that Beener poked her with his penis everywhere around her vagina, including by the lips, around it and on top, and explained that he put his penis

---

**Id.** at 364 (citation omitted). "[A] defendant has a duty to bring forth any relevant evidence in his behalf." **Id.** (citation omitted).

[11] Beener fails to provide evidence of why counsel would not have obtained the cell phone records of the complainant prior to the conclusion of trial.

[12] "If the trial court does not grant a new trial, the four hurdles become even harder to clear on appeal due to our scope and deferential standard of review [because] the implications of after-discovered evidence are **peculiarly** within the discretion of the trial court." **Id.** (citation, footnote and internal quotation marks omitted; emphasis in original).

in her mouth several times while he masturbated. (***See id.*** at 58-60, 62). In the text messages, the Victim admits that she does not understand "any of this court stuff," stating that Beener did not rape her, but did "lots of gross things" and that he "put his dick in her mouth." (Post-Sentence Motion, at Exhibit A).

It was not an abuse of discretion for the trial court to interpret the text messages to mean that the Victim did not understand that the legal definition of rape includes not only vaginal penetration, but also entrance into the labia or mouth.[13] The text messages merely corroborates the trial testimony that the Victim denied vaginal penetration, but that Beener raped her by penetrating her orally and when his penis entered her labia. Therefore, the second part of the test fails.

As to the third and fourth prongs, Beener himself states that the text messages are important because the entire case hinges on the credibility of the Victim's testimony that he sexually assaulted her. It is difficult then to see how they would be used as anything other than to impeach the Victim's

---

[13] "A person commits [rape] when he or she engages in sexual intercourse with a complainant … [w]ho is less than 13 years of age." 18 Pa.C.S. § 3121(a)(6). "In addition to its ordinary meaning, [sexual intercourse] includes intercourse per [mouth] or per anus, with some penetration however slight[.]" 18 Pa.C.S. § 3101. "Penetration need not reach the vagina or farther reaches of female genitalia." ***In re A.D.***, 771 A.2d 45, 49 (Pa. Super. 2001) (citation omitted); ***Commonwealth v. Bowes***, 74 A.2d 795 (Pa. Super. 1950) (holding that entry into the labia is sufficient to prove penetration).

- 19 -

credibility. Additionally, because the text messages merely corroborate the trial evidence, their admission would not be likely to result in a different verdict if a new trial were granted.

Based on the foregoing, the trial court did not abuse its discretion in declining to grant Beener's motion for a new trial based on after-discovered evidence. *See Padillas*, 997 A.2d at 361. This issue lacks merit.

## III.

Beener argues that the trial court erred when, on the basis of the Rape Shield Law, it denied his motion *in limine* to introduce the Victim's earlier police report of sexual abuse filed in another county against a wholly unrelated defendant.[14], [15] He maintains that the purpose of the evidence was to establish the Victim's alleged history of manipulation and false reporting, not to attack her chastity or character generally and, therefore, the Rape Shield

---

[14] Our standard of review of this matter is well-settled. "When reviewing a trial court's denial of a motion *in limine,* this Court applies an evidentiary abuse of discretion standard of review." *Commonwealth v. Schley*, 136 A.3d 511, 514 (Pa. Super. 2016) (citation omitted). "Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Commonwealth v. Herring*, 271 A.3d 911, 918 (Pa. Super. 2022), *appeal denied*, 288 A.3d 865 (Pa. 2022) (citation omitted).

[15] Beener also maintains that preclusion of this evidence violated his constitutional right to confrontation. (*See* Beener's Brief, at 11). However, other than making the conclusory statement that some applications of the Rape Shield Law can violate a defendant's right to confrontation, he does not develop this claim in any meaningful way.

Law was inapplicable. He argues that this Court should grant a new trial based on *Commonwealth v. Palmore*, 195 A.3d 291 (Pa. Super. 2018),[16] and *Schley*, 136 A.3d at 515.

Pursuant to the Rape Shield Law:

**(a) General rule.—Evidence of specific instances of the alleged victim's** past sexual conduct, past sexual victimization, **allegations of past sexual victimization** … **shall not be admissible** in prosecutions of any offense listed in subsection (c)[.]

18 Pa.C.S. § 3104(a) (emphases added).

The purpose of the Rape Shield Law is to "prevent a trial from shifting its focus from the culpability of the accused toward the virtue and chastity of the victim ... [and] to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault complainants." *Commonwealth v. K.S.F.*,

---

[16] *Palmore* is factually distinguishable and not persuasive. In *Palmore*, the appellant reported to the complainant's boyfriend that he saw her having sex with his roommate and appellant's trial theory was that the complainant fabricated the assault against him to lower his credibility in her boyfriend's eyes. This Court held that the trial court erred in precluding the evidence where the "timing of victim's report and defendant's communication with boyfriend was logically consistent with defendant's theory, as victim admitted she saw defendant's message to boyfriend before she contacted police, and defendant was not seeking to impugn victim's character or to label her as promiscuous." *Palmore*, 195 A.3d at 294-95.

Here, Beener sought to introduce evidence of a previous sexual assault report by the Victim in a case in a different county, against someone with no connection to Beener, "based on hearsay, speculation and conjecture." (Trial Ct. Op., at 35). The Chester County case was wholly unrelated to this case and none of its facts could be relevant to any alleged motive to fabricate a claim against Beener in this case. *Palmore* is inapposite.

- 21 -

102 A.3d at 480, 484 (Pa. Super. 2014) (citations omitted); *see also id.* at 483–84 (stating that "[e]vidence that tends to impeach a witness' credibility is not necessarily inadmissible because of the Rape Shield Law.").

In *Schley*, the defendant was charged with endangering the welfare of a child (EWOC) for failing to report abuse allegations made by her adoptive child about Schley's husband, Charles. The defendant sought to introduce evidence of the complainant's three previous false sexual assault allegations against non-family members, which she argued "was highly probative of Schley's reasonable belief that the complainant's allegation against Charles was just one more in a series of fabrications, and Schley's conclusion that the latest allegation was similarly untruthful."[17] *Schley*, 136 A.3d at 518 (record citation and brackets omitted).

The trial court denied Schley's motion *in limine,* ruling that the Rape Shield Law precluded the introduction of the false sexual assault allegations into evidence. On appeal, this Court disagreed and found that the Rape Shield Law did not bar the complainant's false sexual assault allegations because the evidence did not concern her past sexual conduct or reflect on her reputation for chastity. *See id.* at 517-18.

---

[17] *See Commonwealth v. Cardwell*, 515 A.2d 311, 314 (Pa. Super. 1986) (stating that the crime of EWOC requires a showing of a knowing violation of a duty of care).

However, we explained that even if the evidence was improperly precluded on the basis of the Rape Shield Law, it only would be properly admitted if relevant and probative and Schley was only due relief if she was prejudiced by the court's decision. *See id.* at 518; *see also* Pa.R.E. 401 (providing that evidence is relevant where "it has any tendency to make a fact more or less probable than it would be without the evidence" and it "is of consequence in determining the action.").

Schley argued that "the excluded evidence was probative of whether [] [she] actually was aware that the complainant was in circumstances that could have threatened her physical or psychological welfare." *Id.* (emphasis omitted). This Court concluded that Schley was prejudiced because, "by denying [her] [m]otion before trial, the trial court's decision inherently affected [] Schley's overall theory of defense and trial strategy, including, among other things, her decision whether or not to testify." *Id.* at 518 (record citation and brackets omitted).

In this case, Beener argues that the evidence was improperly precluded pursuant to the Rape Shield Law because it does not concern the Victim's past sexual conduct or reflect on her reputation for chastity. We agree but that does not end our inquiry. *See Schley* at 518.

The trial court observed that "[i]n addition to the entirely speculative nature of the proposed evidence, which th[e] court found completely irrelevant, Beener failed to show how this evidence of a prior allegedly false

report against someone other than him would exculpate [him]." (Trial Ct. Op., at 35-36).

We agree. Unlike in **Schley** where the evidence was relevant to a material issue in the case whether the defendant knowingly endangered the welfare of the complainant, Beener merely speculates that the Victim's report to the Chester County police contained allegedly false information about the rape by a third party. Beener has also failed to establish that the outcome of the proceedings would have been any different had this evidence been admitted.

Accordingly, because he failed to establish prejudice, Beener is due no relief on his claim that the trial court improperly precluded the speculative evidence that the Victim misreported another rape to law enforcement in Chester County. **See Schley**, 136 A.3d at 518.

**IV.**

Beener complains that the trial court erred in granting the Commonwealth's motion to admit prior bad acts evidence.[18] Specifically, he asserts that the court allowed the "prejudicial" testimony concerning an incident involving him masturbating in plain view of a neighbor child and exclaiming to her mother that he was only trying to give the girl a balloon.

---

[18] As we observed previously, this Court reviews the trial court's decision to admit evidence for an abuse of discretion. **See** footnote 14, *supra*.

It is well-settled that:

Evidence of "other crimes, wrongs, or other acts" is inadmissible solely to show a defendant's bad character or his propensity for committing criminal acts. Pa.RE. 404(b)(1). Such evidence is admissible, however, when relevant for another purpose, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. Pa.RE. 404(b)(2). This Court has also recognized the *res gestae* exception, permitting the admission of evidence of other crimes or bad acts to tell "the complete story." Such evidence may be admitted, however, "only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.RE. 404(b)(2).

*Commonwealth v. Hairston*, 84 A.3d 657, 665 (Pa. 2014), *cert. denied*, 574 U.S. 863 (2014) (case citations omitted).

Relevant and probative evidence that bolsters a sexual assault victim's credibility is admissible in certain circumstances because "[b]y their very nature, sexual assault cases have a pronounced dearth of independent eyewitnesses, and there is rarely any accompanying physical evidence .... [In these] cases the credibility of the complaining witness is always an issue." *Commonwealth v. Wattley*, 880 A.2d 682, 687 (Pa. Super. 2005) (citation omitted). The trial court must first examine the details and surrounding circumstances of each criminal incident to ensure that the evidence reveals criminal conduct which is distinctive. *See Commonwealth v. Saez*, 225 A.3d 169, 180 (Pa. Super. 2019), *appeal denied*, 234 A.3d 407 (Pa. 2020). "Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime; as well as the time, place, and types of victims typically chosen by the perpetrator." *Saez*, 225 A.3d at

180 (citation omitted). There is no specific timeframe that dictates the applicability of an exception, rather the remoteness of relevant evidence affects the weight of that evidence and not its admissibility. *See Commonwealth v. Drumheller*, 808 A.2d 893, 904-05 (Pa. 2002).

"Rule 404(b) does not distinguish between prior and subsequent acts." *Wattley*, 880 A.2d at 685 (citation omitted). Although evidence of a subsequent offense may be less probative of intent than evidence of a prior offense, "evidence of a subsequent offense can still show the defendant's intent at the time of the prior offense." *Id.* at 687 (citation omitted). As it relates to the exception for a common scheme, plan or design, this Court has observed that:

> [E]vidence of other crimes or acts may be admitted if such evidence proves a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others. A common scheme may be relevant to establish any element of a crime, where intent may be shown through a pattern of similar acts.
>
> The degree of similarity is an important factor in determining the admissibility of other crimes or bad acts under this exception. *See Commonwealth v. Luktisch*, 680 A.2d 877, 879 (Pa. Super. 1996) (finding testimony of prior sexual abuse upon other children in the same family relevant to demonstrate a common scheme); *Commonwealth v. Smith*, 431 Pa. Super. 91, 635 A.2d 1086, 1089-1090 (1993) (holding evidence of prior crimes was admissible to show a recurring sequence of acts by defendant). Furthermore, the importance of the intervening time period is inversely proportional to the similarity of the crimes in question.

*Saez*, 225 A.3d at 178 (quotation marks and some citations omitted). "The common scheme exception does not require that the two scenarios be

identical in **every** respect." ***Commonwealth v. Gilliam***. 249 A.3d 257, 272 (Pa. Super. 2021) (citation omitted; emphasis in original).

Once the court concludes that the evidence is admissible for one or more of the limited purposes, it must then conduct a balancing inquiry to determine whether the evidence's probative value outweighs its potential for unfair prejudice. ***Hairston***, 84 A.3d at 665 (citation omitted). Evidence of other crimes will not be prohibited merely because it is harmful to the defense. ***See id.*** at 666. Rather, "'unfair prejudice means a tendency to suggest a decision on an improper basis or to divert the [factfinder's] attention away from its duty of weighing the evidence impartially." ***Id.*** at 666 (citing Pa.RE. 403 cmt.). This Court "must presume that the trial judge, sitting as factfinder, would ignore any potentially prejudicial information and remain objective in weighing the evidence in order to render a true verdict." ***Wattley***, 880 A.2d at 685 (citations omitted).

Instantly, the Commonwealth sought to introduce evidence of Beener's subsequent bad act to establish a common scheme, plan or design, his intent, and to bolster the Victim's credibility. The trial court found sufficient factual similarities between acts committed against the Victim and those committed against Ms. DeAngelo's daughter on June 6, 2014, and that the evidence's admission was not unfairly prejudicial. We discern no abuse of discretion.

The crimes against the Victim and Ms. DeAngelo's daughter (M.D.) included several similarities. Both the Victim and M.D. were very young (M.D.

- 27 -

was five years old and the Victim's first memory of Beener's sexual conduct was when she was six years of age). The girls were both Caucasian. The crimes involved similar sex acts, including Beener masturbating in front of both the Victim and M.D. This took place at Beener's residence where he lured both victims with balloons. Both victims were previously acquainted with Beener (the Victim was Beener's niece by marriage and M.D. was his next-door neighbor and the granddaughter of his wife's best friend, who also lived in the house).

Additionally, although there were approximately five years between the incidents, the trial court found that the prior crime was not too remote to be relevant. We discern no abuse of discretion where the two acts bore such similarities and the remoteness of the crime went to its weight, not its admissibilty. **See Saez**, 225 A.3d at 178 (the importance of the intervening time period "is inversely proportional to the similarity of the crimes in question."); **Drumheller**, 808 A.2d at 904-05. Finally, we agree with the trial court that the prior bad acts evidence was not unduly prejudicial. Its probative value outweighed its prejudicial effect since it did not tend to suggest an improper verdict, particularly where Beener opted for a bench trial and we presume that the trial court remained objective in weighing the evidence. **See Wattley**, 880 A.2d at 685 (citations omitted). This issue fails.

**V.**

Beener maintains that the verdict was against the weight of the evidence.[19] His "argument, in essence, [is] that [the trial court] should not have found [Ms.] Morgan's testimony credible and the evidence adduced at trial is certainly against the verdict for rape of a child[.]" (Beener's Brief, at 17).

> For an appellant to prevail on a challenge to the weight of the evidence, he must establish that the evidence was so tenuous, vague, and uncertain that the verdict shocks the conscience of the court. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence. Moreover, the weight of the evidence is exclusively for the finder of fact, who is free to believe all, none, or some of the evidence and to determine the credibility of the witnesses.

***Commonwealth v. Gilliam***, 249 A.3d 257, 269-70 (Pa. Super. 2021), *appeal denied*, 267 A.3d 1213 (Pa. 2021) (citations, quotation marks and brackets omitted); *see also **Commonwealth v. Charlton***, 902 A.2d 554, 562 (Pa. Super. 2006), *appeal denied*, 911 A.2d 933 (Pa. 2006) ("It [is] within the

---

[19] It is well-settled that:

> [O]ur standard of review for a weight of the evidence claim is an abuse of discretion. As we have often reminded appellants, [a]n appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

***Commonwealth v. Rogers***, 259 A.3d 539, 541 (Pa. Super. 2021) (citation, quotation marks and emphases omitted).

province of the ... fact-finder to resolve all issues of credibility, resolve conflicts in evidence, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately adjudge appellant guilty.") (citation omitted).

The trial court explains:

… [T]his court found [Victim] to be an unsophisticated and very credible and courageous witness. She provided clear testimony about all of the events occurring over several years, beginning with the first she could specifically remember that occurred in the Beener's bed when she was six (6) years old [through her testimony] about several incidents that occurred when she was nine (9) or ten (10) and explained that she stopped going to Appellant's house when she was twelve (12) years old. She did not testify using generic descriptions of the sexual assaults by [Beener] but, rather, she testified in detail as to the different acts on multiple occasions that he engaged in. She described the contents of the garage, including the white chair [Beener] would make her sit on while he masturbated as she held his testicles.

[Victim] also candidly admitted that [Beener] did fun things with her as well as the "bad stuff" and … [t]he court was also struck by the love [Victim] clearly felt for her Aunt Kelly, … and her sense of loss and how much she missed her aunt since [she] came forward in 2018. Finally, the court credited the testimony of Esmeralda Delgado, Trevor Young and Mr. Morgan. In particular, the court took into account the fact that Ms. Delgado and [Victim] were no longer friends and had not spoken for some time, and yet Ms. Delgado willingly came into court and corroborated several aspects of [Victim's] testimony.

Contrary to [Beener]'s assertion, the court also found the majority of Gregory Beener's testimony to be credible. … Mr. Beener testified candidly that he was not always home when [Victim] was there, and when he was home, he was rarely in the same room with her and his father. Moreover, Mr. Beener corroborated multiple aspects of [Victim's] testimony, including how much [she] loved her aunt, his mother, that his father had a car in the garage that he was working on, his father enjoyed having balloons around the house and in the pool, he found a

- 30 -

pornographic videotape in his parents' bedroom when he was young, and that [Victim] would go upstairs with his father and watch movies while he was downstairs playing video games. The court has no doubt Mr. Beener loves his father and was not surprised that Mr. Beener believed that both Emily DeAngelo and [Victim] were lying.

… [T]he court found Mr. Hawke's testimony regarding his conversation with [Victim] to be credible. In particular, Mr. Hawke testified that [she] denied any penetration by [Beener], but conceded that he had not explained the legal definition of rape to her either before he asked the question or after her response. As previously stated, this court found [Victim] to be an unsophisticated young woman who testified truthfully regarding [Beener]'s assaults upon her at a time when she was vulnerable and did not understand the legal implications of his acts. …

Finally, this court as factfinder found as a matter of law that [Beener] penetrated [Victim] pursuant to the definition of sexual intercourse when he entered her labia on at least two (2) occasions with his penis in addition to penetrating her mouth as he masturbated on more than one occasion when [Victim] was between the ages of six (6) and twelve (12). Accordingly, [Beener]'s final issue on appeal must also fail.

(Trial Ct. Op., at 46-48).

We discern no abuse of discretion. The court was free to believe all, some or none of the evidence, and to the extent there were any inconsistencies, it was within its province to resolve them. **See Charlton**, 902 A.2d at 562. We will not re-weigh the evidence or override the trial court's credibility decision. **See Gilliam**, 249 A.3d at 269-70. Because we discern no abuse of discretion, this issue lacks merit. **See Rogers**, 259 A.3d at 541.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/17/2023